STATE OF NORTH CAROLINA v. YAHWEH ALLAH ISRAEL

No. 256A99

(Filed 21 December 2000)

## 1. Homicide— first-degree murder—sufficiency of evidence

The trial court did not err by denying defendant's motion to dismiss a charge of first-degree murder for insufficient evidence where the evidence was close and circumstantial; the evidence on a motion to dismiss must be viewed in the light most favorable to the State, including none of defendant's evidence unless it is favorable to the State. Whether the trial court erred by excluding evidence tending to exonerate defendant and inculpate someone else is a different question.

## 2. Evidence— guilt of another—admissible

There was prejudicial error in a first-degree murder prosecution where the trial court excluded evidence which cast doubt upon the State's evidence that defendant was the perpetrator of the crime and which implicated another person beyond conjecture or mere implication. The evidence was relevant and admissible and it is apparent that there is a reasonable possibility of a different result had the trial court not erred. N.C.G.S. § 8C-1, Rule 402; N.C.G.S. § 15A-1443(a).

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Smith (W. Osmond), J., on 22 September 1998 in Superior Court, Wake County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 17 October 2000.

*Michael F. Easley, Attorney General, by David F. Hoke, Assistant Attorney General, for the State.*

*James G. Exum, Jr., and Mary March Exum for defendant-appellant.*

FREEMAN, Justice.

We address two questions in this appeal of defendant's conviction for murder—first, whether the State's evidence was sufficient to warrant its submission to the jury, and second, whether certain evidence tending to exonerate defendant and implicate another in this

STATE v. ISRAEL

[353 N.C. 211 (2000)]

crime was erroneously excluded from the jury's consideration. We conclude that the evidence, when viewed in the light most favorable to the State, was sufficient to warrant its submission to the jury and to sustain defendant's conviction of murder in the first degree. But no matter how ample and damning this evidence may be, when other evidence tending to show the crime was perpetrated by another is erroneously excluded from the jury's consideration, the sufficiency of the remainder is eroded, the evidentiary foundation for the conviction is unreliable, and the defendant is entitled to a new trial.

The facts of this case, presented in the light most favorable to the State, are as follows: The body of the victim, an elderly lady, was found in the bedroom of her apartment by her son on 13 December 1996. The victim had been bound and gagged, and her bedroom apparently ransacked. The mattress was on the floor; a checkbook cover and various papers apparently from the victim's purse were strewn about; the dresser drawers were awry, and such contents as jewelry, belts, and sewing articles had been dumped on the floor and on the bed. The victim's empty change purse, into which her son testified she typically put the money he gave her, was on the mattress. Only in attempting to replace the mattress did the son discover his mother's body. He called emergency personnel, who found no vital signs and did not attempt resuscitation. The victim's hands had been tightly tied behind her back with a nightgown and a shoelace apparently from her own shoe, found beside her under the mattress; her ankles had been tied with a nightgown; another was around her neck; and dried blood had collected around her mouth, into which a sock had been stuffed and tightly secured with a belt and a robe.

The bedroom was in disarray, but the remainder of the apartment was orderly, and there were no signs of forced entry. A briefcase containing a green toboggan, a chess set, and religious books was sitting open on the living room sofa.

The State's forensic pathologist testified that the victim had died of asphyxiation by strangulation and that the autopsy could not rule out the evening of Tuesday, 10 December 1996, as a time of death and as being "perfectly consistent with the degree of composition."

A neighbor from the Sir Walter Raleigh Apartments, where the victim lived, reported to an investigating officer that she had smelled cooking food coming from the victim's apartment the morning of 10 December; another neighbor testified she had last seen the victim in the apartment building that afternoon. A surveillance videocamera

mounted at the only entrance to the apartment building showed the victim entering at 7:58 that night. No portion of the videotape showed the victim leaving the building after that time.

The videotape showed defendant entering the apartment building at 9:24 p.m. on 10 December and leaving that night at 11:38. It did not show defendant entering or leaving the building thereafter. A resident of the apartment building who knew defendant recognized his image on the videotape and recalled entering the building with him the night of the 10th and greeting him. Defendant told him he was "coming to visit a friend." He knew defendant carried a briefcase.

Defendant could not be found after the warrant was issued for his arrest, but he was located six months later in Newport News, Virginia. In a statement taken there, defendant said that he knew the victim and called her "Auntie," and that he had been in her apartment and had left his briefcase and chess set there. Although he said he had been in Virginia the entire month of December, he admitted that a surveillance camera photograph taken on 10 December depicted him. The director of the Newport News shelter said that records indicated defendant had checked into the shelter on 19 December and had stayed there twenty-one nights, but that defendant had not stayed there between the 10th and the 13th of December.

A witness for the State testified that she had met defendant in September 1996 in downtown Raleigh and had permitted him to move into her apartment. He stayed there two or three weeks, but she asked him to leave because he took money from her purse twice, later admitting to her that he had done so. Defendant subsequently called the witness several times, but she immediately hung up the phone. Many hang-up calls were recorded by her answering machine during the first part of December, one being made, phone records showed, from the victim's apartment at 10:01 p.m. on December 10th.

A number of fingerprints—one from the exterior door frame of the victim's apartment; six on a pharmacy bag in the victim's kitchen trash; and four, plus a partial bloody fingerprint, on a folded piece of paper found in the victim's bedroom—were all identified as belonging to defendant. The DNA profile of the single bloody print matched defendant.

The trial court admitted some evidence offered by defendant tending to exonerate him. This included the testimony of one resi-

dent of the Sir Walter Raleigh Apartments that she had seen the victim outside her door Wednesday morning, 11 December. A second resident testified that he had seen the victim in the lobby later the afternoon or evening of the 11th. Both admitted on cross-examination that it could have been Tuesday, 10 December, not Wednesday, that they had seen the victim.

Conflicting evidence regarding the time of the victim's death was also presented by defendant and elicited on cross-examination of the forensic expert testifying for the State. In his initial report, the State's forensic expert had stated the time of death was Thursday, 12 December. This he later changed to 11 December. He testified that death occurred thirty-six to forty-eight hours before the body was refrigerated at the morgue at 6:00 p.m. on 13 December. He never opined that the murder occurred on the night of the 10th, but he stated merely that he could not rule it out as a date of death. A forensic pathologist testifying for the defense said that, although he could not "absolutely" rule out 10 December as a time of death, he believed it to be "very unlikely." His evaluation of reports and photographs of the body indicated to him the victim had more likely died "well into" Wednesday or Thursday. These included the EMT report that *rigor mortis* was present in the body when it was found; as *rigor mortis* generally leaves the body within twenty-four to thirty-six hours, its presence on 13 December indicated that the victim had probably died on Wednesday or Thursday, not on Tuesday night, 10 December.

Defendant presented evidence that he had been hospitalized from 28 November to 30 November to have a cyst removed from his neck. Defendant's treating physician opined the cyst removal could have led to minor bleeding, which defendant argues explains the bloody fingerprint. Defendant also notes that investigators had lifted 134 fingerprints from the scene but had identified only one print in the bedroom as belonging to him; of the remainder, eighty belonged to the victim. A print on the top center of the headboard was unidentifiable as either defendant's or the victim's, as were some fifty to sixty prints lifted from the bedroom, including the dresser from which the items used to strangle the victim presumably had been taken. Altogether, only eleven prints, including those on the pharmacy bag and "receipt," belonged to defendant. Two latent prints were found on a bottle of malt liquor in the victim's trash can: one belonged to the victim; the other was not defendant's but was otherwise unidentified. Likewise, a print on the right outside of the bedroom door was neither defendant's nor the victim's.

**STATE v. ISRAEL**

[353 N.C. 211 (2000)]

Finally, defendant's evidence revealed that the witness with whom defendant stayed for two weeks in November admitted on cross-examination that defendant always returned the money he took from her and that he had given her money he had earned, which she kept in her purse.

Other evidence that defendant sought to introduce but that was barred by the trial court's rulings implicated another person, Marvin Mitchell, as the perpetrator of this crime. According to testimony proffered by the victim's son and granddaughter, Mitchell was an ex-boyfriend of the victim's, who had a history of assaulting her and stealing from her. The victim's son moved his mother into the Sir Walter Raleigh Apartments because he feared for her safety. His mother feared Mitchell and was disillusioned with the criminal justice system because it had failed to detain Mitchell sufficiently when she brought charges against him. The victim's granddaughter would have testified that her grandmother, whom Mitchell had assaulted as recently as late summer or early fall of 1996, was afraid of him and that Mitchell took money from her "all the time." The granddaughter would have testified to Mitchell's assaults on her grandmother during the period she lived with her grandmother—from the victim's black eye to Mitchell's breaking the glass of a window in the victim's home and reaching through and grabbing her, holding her by the hair. The latter precipitated the granddaughter's decision to move out. The granddaughter would have testified that she had seen Mitchell drink forty-oz. bottles of Schlitz malt liquor, the same beverage as the bottle found in the victim's kitchen trash with her fingerprints and those of someone else who was not defendant. The granddaughter would also have testified that she had met defendant one time and that her grandmother had introduced him as their "cousin."

Other evidence the jury was not permitted to hear included officers' testimony that Mitchell had been a suspect in the city-county investigation of the victim's murder. Although he stated to investigators that he had never been to the Sir Walter Raleigh Apartments and did not even know where they were, Mitchell had been seen there before by three other residents. Mitchell gave investigators an alibi for the entire week of 9-13 December, yet he was identified on the surveillance videotape by the victim's granddaughter entering and leaving the Sir Walter Raleigh Apartments twice during the week of the murder—on 9 and 11 December. The day the victim's body was discovered, Mitchell moved to another residence.

**[1]** Defendant asserts on appeal that the trial court erred in denying his motion to dismiss for insufficiency of evidence to convict. We conclude the evidence of defendant's guilt as presented to the jury was sufficient as a matter of law to support its doing so. But the trial court's erroneous exclusion of evidence that tended both to exonerate defendant and implicate another perpetrator of the victim's murder so infects the evidence supporting conviction that it cannot be said the error did not affect the outcome of defendant's trial. *See* N.C.G.S. § 15A-1443(a) (1999).

When a defendant moves for dismissal based on insufficiency of the evidence,

> "the trial court must determine whether there is substantial evidence of each essential element of the offense charged (or of a lesser offense included therein), and of the defendant['s] being the one who committed the crime. If that evidence is present, the motion to dismiss is properly denied. 'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980)."

*State v. McElrath*, 322 N.C. 1, 366 S.E.2d 442 (1988) (quoting *State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 387 (1984) (citation omitted).

> In ruling on a motion to dismiss, the evidence must be considered by the court in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn from the evidence. Contradictions and discrepancies must be resolved in favor of the State, and the defendant's evidence, unless favorable to the State, is not to be taken into consideration. The test of the sufficiency of the evidence on a motion to dismiss is the same whether the evidence is direct, circumstantial, or both. All evidence actually admitted, both competent and incompetent, which is favorable to the State must be considered.

*Bullard*, 312 N.C. at 160, 322 S.E.2d at 387-88 (citations omitted), *quoted in McElrath*, 322 N.C. at 9-10, 366 S.E.2d at 447.

As in *McElrath*, the specific question before us is "whether, upon viewing all the evidence in the light most favorable to the State and upon granting the State every reasonable inference to be drawn from

the evidence, a reasonable juror might accept the evidence as adequate to support the conclusion this defendant was in fact the perpetrator of this . . . crime." *Id.* at 10, 366 S.E.2d at 447 (citations omitted). And, as in *McElrath*, we answer this question, "yes."

The law's bias towards the State that governs the trial court's appraisal of the evidence on defendant's motion to dismiss, including its considering none of defendant's evidence unless it is favorable to the State, supports the trial court's denial of such motions even when the evidence is close and circumstantial. *See McElrath*, 322 N.C. 1, 366 S.E.2d 442. Whether the trial court erred in excluding from the *jury's consideration* such evidence, unfavorable to the State's case, that defendant would otherwise have presented tending to exonerate him and indicating another perpetrator of this crime is, however, a different question, governed by different rules of law. Rule 401 of the North Carolina Rules of Evidence and cases construing it address this genre of question. "The admissibility of evidence of the guilt of one other than the defendant is governed now by the general principle of relevancy [stated in Rule 401.]" *State v. Cotton*, 318 N.C. 663, 667, 351 S.E.2d 277, 280 (1987).

[2] The rule of relevancy for evidence of this nature is that it must do more than cast doubt over the defendant's guilt merely because it is possible some other person could have been responsible for the crime with which he has been charged.

> Evidence that another committed the crime for which the defendant is charged generally is relevant and admissible as long as it does more than create an inference or conjecture in this regard. It must point directly to the guilt of the other party. Under Rule 401 such evidence must tend *both* to implicate another *and* be inconsistent with the guilt of the defendant.

*Id.* at 667, 351 S.E.2d at 279-80 (citations omitted). In *Cotton*, three sexual assaults had occurred in the vicinity where the victim lived of whose assault the defendant was convicted. One of the other victims described an assailant of the same physical type as the defendant, dressed similarly; and, most notably, a *modus operandi* so similar to the other two that "the jury reasonably could have concluded that the three attacks were committed by the same person." *Id.* at 667, 351 S.E.2d at 280. But the court excluded the other victim's positive identification of another perpetrator, even though the victim of the crime charged to defendant was equivocal in identifying him as her

assailant. Doing so, we held, was prejudicial error. *Cf. State v. Annadale*, 329 N.C. 557, 406 S.E.2d 837 (1991) (crimes committed by another person with *modus operandi* similar to offense with which the defendant charged correctly determined insufficiently similar and too remote in time).

In *State v. McElrath*, the defendant was precluded from introducing a map—evidence of a larceny scheme in which his murdered son-in-law and companions appeared to be involved. We held that the preclusion was error. Such evidence "casts doubt upon the State's evidence that defendant was the killer and suggests instead an alternative scenario for the victim's ultimate demise." 322 N.C. at 14, 366 S.E.2d at 449.

In *State v. Rose*, by contrast, a detective responding to a question whether he had an opinion as to the number of persons involved in the murders said he had believed, immediately after the murders, that a particular, named individual other than the defendant had knowledge of the murders and might have been involved. 339 N.C. 172, 451 S.E.2d 211 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995). We noted that, absent evidence exculpating the defendant, this opinion was "mere conjecture" of another's involvement, not evidence that another person had committed the murders. *Id.; see also State v. Hamilton*, 351 N.C. 14, 20, 519 S.E.2d 514, 518 (1999) (evidence of knife threat to victim ten years before murder did not "point directly" to guilt of that person as perpetrator), *cert. denied*, 529 U.S. 1102, 146 L. Ed. 2d 783 (2000); *State v. Moseley*, 338 N.C. 1, 449 S.E.2d 412 (1994) (no error in excluding testimony about dark hair found under fingernail of victim when it failed to point directly to another's guilt and was not inconsistent with that of the defendant), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995); *State v. Brewer*, 325 N.C. 550, 386 S.E.2d 569 (1989) (excluded testimony concerning suspicious occupants of a car similar to another on same back road, one of which was involved in car chase and shootings, and one of which was allegedly driven by the deputy's son, gave rise to no more than speculation and conjecture), *cert. denied*, 495 U.S. 951, 109 L. Ed. 2d 541 (1990).

" 'Evidence which tends to show nothing more than that someone other than the accused had an opportunity to commit the offense, without tending to show that such person actually did commit the offense and that therefore the defendant did not do so, is too remote to be relevant and should be excluded.' " *Brewer*, 325 N.C. at 564, 386 S.E.2d at 576, (quoting *State v. Britt*, 42 N.C. App. 637, 641,

257 S.E.2d 468, 471 (1979)). But defendant's excluded evidence in the case before us is significantly different. Here, defendant not only proffered evidence that someone other than he had the opportunity to kill the victim, but proffered the identity of that person and a history of his violent, recent dealings with her. That person had both the opportunity to kill her—pictured as he was on the surveillance videotape entering and leaving the victim's apartment the evening of 11 December—and, given his history with the victim, a possible motive. The State's evidence of defendant's own guilt was circumstantial, although ample evidence supported his recent interaction with the victim. Equally ample was excluded evidence of Marvin Mitchell's own recent interaction with her, and the history of his dealings with her point to more sinister motives than any left behind in defendant's fingerprints or personal effects. Relevant evidence is, as a general matter, admissible. N.C.G.S. § 8C-1, Rule 402 (1999). "[T]he standard [of relevance] in criminal cases is particularly easily satisfied. 'Any evidence calculated to throw light upon the crime charged' should be admitted by the trial court.' " *McElrath*, 322 N.C. at 13, 366 S.E.2d at 449 (quoting *State v. Huffstetler*, 312 N.C. 92, 104, 322 S.E.2d 110, 118 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985)).

Because the excluded evidence cast doubt upon the State's evidence that defendant was the perpetrator of this crime and because it implicated another person as that perpetrator beyond conjecture or mere implication, it was relevant and admissible. We hold that the trial court erred in barring its admission. Further, it is apparent from the equivocal evidence of defendant's guilt and other, excluded evidence of Marvin Mitchell's involvement with the victim that, had the trial court not so erred, "there is a reasonable possibility that a different result would have been reached at the trial out of which [this] appeal arises." N.C.G.S. § 15A-1443(a).

For these reasons, we hold that defendant is entitled to a new trial in this case.

NEW TRIAL.