STATE v. WASHINGTON

[192 N.C. App. 277 (2008)]

STATE OF NORTH CAROLINA v. FRANKIE DELANO WASHINGTON

No. COA07-1517

(Filed 2 September 2008)

**Constitutional Law— speedy trial—delay of nearly five years—*Barker* factors**

Defendant was denied his constitutional right to a speedy trial by a delay of four years and nine months given defendant's repeated efforts to expedite his trial, the length of the delay, the overwhelming evidence that the delay could have been avoided if the State had exercised even the slightest care during the course of the prosecution, and the fact that the delay actually prejudiced defendant at trial. None of the factors from *Barker v. Wingo*, 407 U.S. 514, weigh in favor of the State.

Appeal by defendant from judgments entered 26 February 2007 by Judge Henry W. Hight in Durham County Superior Court. Heard in the Court of Appeals 1 May 2008.

*Attorney General Roy Cooper, by Assistant Attorney General Kevin Anderson, for the State.*

*Parish, Cooke & Condlin, by James R. Parish, for defendant appellant.*

McCULLOUGH, Judge.

Frankie Delano Washington ("defendant") appeals his convictions of first-degree burglary, two counts of second-degree kidnapping, robbery with a dangerous weapon, attempted robbery with a dangerous weapon, assault and battery, and attempted first-degree sex offense. We vacate and dismiss.

The relevant facts and procedural history are as follows: At around 2:45 a.m. on 30 May 2002, sixteen-year-old Mary Katherine Breeze ("Katherine") returned home from a party. Katherine entered her home located at 911 North Gregson Street in the Trinity Park neighborhood of Durham through a sliding door on the side of the house. She testified at trial that although the neighborhood was a "little bit of a rough neighborhood," she did not want to wake her parents. Accordingly, she did not lock the door as she came in. Mary Breeze ("Mrs. Breeze"), Bill Breeze ("Mr. Breeze") and their twelve-year-old son, Will, were the only ones home at the time.

STATE v. WASHINGTON

[192 N.C. App. 277 (2008)]

At around 3:00 a.m., an intruder entered the Breezes' home through the unlocked sliding glass door. The intruder was a "light complected" African-American male, wearing blue jeans, tan boots, and a dark-colored T-shirt with some sort of white writing on the front and back. The intruder wore a blue bandana over his nose and mouth and had a dark covering on his head, leaving only a "small slice of the front of his head" exposed. He was not wearing any gloves.

The Breezes were awakened by the barks of their family dog. Without putting on his glasses, Mr. Breeze went downstairs to check on the dog. When he reached the bottom landing of the stairs, the intruder pointed a sawed-off shotgun toward Mr. Breeze's face and ordered him to give him his money.

Mrs. Breeze heard scuffling, came out of her bedroom, and peered down the spiral staircase. Although she was not wearing her glasses, Mrs. Breeze could see the intruder standing on the landing in front of the staircase, holding a gun to Mr. Breeze's head. Mrs. Breeze screamed, and Will came out of his bedroom into the upstairs hallway. Katherine stayed in her bedroom and dialed 911.

The intruder headed up the stairs, and Mr. Breeze fled the house, seeking help. The intruder pushed Will ahead of Mrs. Breeze and held the gun to the back of Mrs. Breeze's head, threatening that she "was going to give him everything he wanted or he was going to kill [her]." He forced Mrs. Breeze and Will into the living room and pushed Will onto the couch.

While holding a gun to the back of Mrs. Breeze's head, the intruder directed Mrs. Breeze into the den and shut the door. While standing behind Mrs. Breeze, the intruder proceeded to stick his hand into Mrs. Breeze's underpants, reaching her "crotch" area. Mrs. Breeze had just undergone major abdominal surgery and had several drain lines coming from her body. She explained to the intruder, "if you're not careful, you're going to kill me." The intruder removed his hand from her underpants.

Placing the gun to the back of Mrs. Breeze's head, the intruder took her by the arm and told her that he wanted all of her money. She gave the intruder her purse, which contained approximately $150 cash, a palm pilot ("PDA"), and PDA accessories. The intruder then fled through the side door. In total, the intruder was in the Breezes' home for ten to fifteen minutes. At trial, Mrs. Breeze testified that for most of that time, her back was turned towards the intruder.

Mr. Breeze had been unsuccessfully banging on his neighbors' doors when the intruder found him on Markham Street and ordered him to return to his house. Mr. Breeze refused, and the intruder struck him in the face. The intruder then fled down Markham Street towards Duke University. Mr. Breeze followed the intruder and saw him turn onto Watts Street.

Durham police arrived at the Breezes' home shortly thereafter. The Breezes gave law enforcement descriptions of the intruder's clothing and told officers that the intruder appeared to be taller than five foot seven inches and under the age of thirty, with a receding hairline. Although most of the intruder's face was covered by the bandana, Mr. Breeze noted the distinctively young, smooth skin around the intruder's eyes.

Law enforcement used a K-9 unit to track a human scent from the street where Mr. Breeze was assaulted, while Officer William Bell patrolled the area by car.

The K-9 unit had tracked the human scent from Markham Street several blocks, through an alleyway, and through some backyards to Lancaster Street when, sometime between 3:30 a.m. and 4:00 a.m., the unit heard a call out that defendant had been detained. Upon hearing the call, the K-9 unit stopped tracking the scent.

Officer Bell testified at trial that he was patrolling the neighborhood, looking for a black male wearing a blue T-shirt with writing on the front and jeans. He observed defendant, who was forty-one years old and 5 feet 6 inches in height, walking south on the 1200 block of Berkeley Street. Defendant was wearing a blue T-shirt with an emblem on the front of the shirt and white lettering, blue jeans, and "work-type" boots. Defendant was sweating and appeared nervous. His T-shirt was dirty with grass stains, and he had some mud on his jeans.

Officer Bell asked defendant to empty his pockets, and he recovered from defendant a long-handled pair of pliers and a short piece of a clothes hanger. Officer Anthony Smith testified that to his knowledge, defendant did not have any cash on him.

Defendant told Officer Bell that he had been walking from his girlfriend's house on Hillcrest Avenue, which was off of Guess Road. He stated that he was an auto mechanic and that he used the hanger and pliers for his work on cars; however, defendant later told police that he had been smoking crack cocaine in a nearby house on

STATE v. WASHINGTON

[192 N.C. App. 277 (2008)]

Claredon Street. At trial, Lieutenant John Peter testified on cross-examination that small pieces of hanger, like the one recovered from defendant, are commonly used as "push rods." A push rod is a small piece of metal that is used to push out debris from a crack pipe.

Sometime between 4:00 a.m. and 5:00 a.m., law enforcement returned to the Breezes' home and told the Breezes that they had apprehended a suspect fitting the description of the intruder. Police drove Mr. and Mrs. Breeze to defendant, who was standing in custody outside of a police car, about half a mile from the Breezes' home. Defendant was not wearing a bandana or head covering, but he was wearing a navy blue T-shirt with white insignia on the chest, baggy blue jeans, and tan boots.

At trial, Mrs. Breeze testified that in the dark, from about 20 feet from defendant, she identified defendant as the intruder who broke into her home earlier that morning. She stated that she could not determine defendant's age from that distance. Defendant was arrested. Police did not conduct any subsequent pretrial identification procedures.

Later that day, based on a tip from a neighborhood child, Durham Police recovered Mrs. Breeze's black purse, PDA and attachments, a Mossburg sawed-off shotgun, a bandana, and fecal matter in or around a creek in Walltown Park in Durham. Officers recovered a black toboggan in an alleyway on Buchanan Boulevard, between Green Street and Berkeley Street. An unusual cigarette butt was also collected from the Breezes' residence, but it was later determined to be unrelated to the case.

Defendant was held in the Durham County Jail for 366 days, pending State Bureau of Investigation ("SBI") analysis of the above items of physical evidence for trial. After several motions by defendant and incremental reductions by the trial court, on 7 May 2003, the trial court reduced defendant's secured bond to the amount of $37,500.00. Defendant was thereafter released from jail on bond.

From May of 2002 to October of 2004, defendant moved the court twice to compel SBI analysis of the State's evidence. On 18 March 2004, the trial court granted defendant's motion, and ordered the SBI to conduct all of the requested tests. The SBI, however, was never notified of that order.

On 24 June 2005, defendant moved the court to dismiss all charges with prejudice for the State's violation of his right to a speedy

**STATE v. WASHINGTON**

[192 N.C. App. 277 (2008)]

trial. The trial court denied that motion. The SBI finally completed all requested analysis of the evidence on 30 January 2006.

Approximately four years and nine months after defendant's 30 May 2002 arrest, defendant was tried before a jury at the 19 February 2007, 20 February 2007, and 21 February 2007 Criminal Sessions of Durham County Superior Court.

At trial, the State presented the identification testimony of Mr. Breeze, Mrs. Breeze, and Will Breeze as well as the testimony of law enforcement officers as to the location and circumstances of defendant's 30 May 2002 arrest.

SBI lab reports and the expert testimony of SBI lab agents were also admitted as evidence at trial. After analyzing all of the items of evidence collected by police, the SBI determined that only the purse and toboggan contained identifiable physical evidence. SBI examination of this evidence revealed the following: (1) three identifiable fingerprints were found inside of Mrs. Breeze's purse, but none of those prints were a match to defendant; (2) the black toboggan contained the DNA profiles of more than one donor, but none of those profiles were a match to defendant.

Defendant was found guilty of first-degree burglary, two counts of second-degree kidnapping, robbery with a dangerous weapon, attempted robbery with a dangerous weapon, assault and battery, and attempted first-degree sex offense. He was sentenced to consecutive terms of imprisonment of 46 to 56 months, 46 to 56 months, 117 to 150 months, 117 to 150 months, 20 days, and 251 to 311 months, respectively. Defendant was given credit for the 366 days spent in confinement prior to his trial.

On appeal, defendant contends that (1) he was denied his constitutional right to a speedy trial; and (2) the trial court erred by denying his motions to dismiss various charges for insufficiency of the evidence.

## I. Right to a Speedy Trial

Defendant first contends that the four-year and nine-month delay between his May 2002 arrest and his February 2007 trial amounted to a violation of his constitutional right to a speedy trial. Accordingly, defendant contends that his convictions must be vacated and the charges against him must be dismissed with prejudice. We conclude that the circumstances of this case are unprecedented. After

a difficult and sensitive balancing of the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530, 33 L. Ed. 2d 101, 117 (1972), we agree with defendant.

The Sixth Amendment to the United States Constitution and the fundamental law of this State provide every individual formally accused of a crime the right to a speedy trial. *See, e.g., State v. Lyszaj*, 314 N.C. 256, 261, 333 S.E.2d 288, 292 (1985). The Sixth Amendment states, in pertinent part, "in all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. This provision is made applicable to the states by the Fourteenth Amendment. *See Klopfer v. North Carolina*, 386 U.S. 213, 222, 18 L. Ed. 2d 1, 8 (1967). Likewise, Article I, Section 18 of the North Carolina Constitution provides that "[a]ll courts shall be open[] [to] every person . . . without favor, denial, or delay." N.C. Const. art. 1, § 18. When reviewing speedy trial claims, we employ the same analysis under both the Sixth Amendment and Article I. *See State v. Flowers*, 347 N.C. 1, 27, 489 S.E.2d 391, 406 (1997).

In *Barker*, the United States Supreme Court set forth a balancing test involving four interrelated factors for courts to use in determining whether a defendant's constitutional right to a speedy trial has been violated. *Barker*, 407 U.S. at 530, 33 L. Ed. 2d at 116-17. These factors include: (1) the length of the delay; (2) the reason for the delay; (3) defendant's assertion of his right to a speedy trial; and (4) prejudice to defendant resulting from the delay. *Id.* North Carolina courts have adopted these standards in analyzing alleged speedy trial violations. *See State v. Bare*, 77 N.C. App. 516, 519, 335 S.E.2d 748, 750 (1985), *disc. review denied*, 315 N.C. 392, 338 S.E.2d 881 (1986).

Our Supreme Court has emphasized that none of the four factors identified above is determinative; rather they are to be considered together, and each claim is to be decided on a case-by-case basis, after a careful balancing of the facts:

"We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recogni-

tion that the accused's interest in a speedy trial is specifically affirmed in the Constitution."

*State v. Spivey*, 357 N.C. 114, 118, 579 S.E.2d 251, 255 (2003) (quoting *Barker*, 407 U.S. at 533, 33 L. Ed. 2d at 118-19).

With these principles in mind, we now balance the four factors given the evidence contained in the record.

### (1) Length of the Delay

First, the length of the delay is not *per se* determinative of whether a defendant has been deprived of his right to a speedy trial. *See State v. Webster*, 337 N.C. 674, 678, 447 S.E.2d 349, 351 (1994). The United States Supreme Court has noted that "lower courts have generally found post-accusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett v. United States*, 505 U.S. 647, 652 n.1, 120 L. Ed. 2d 520, 528 n.1 (1992). However, " 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry [sic]." *Id.* Here, the length of the delay was approximately four years and nine months. The State concedes that this is enough to trigger examination of the other factors.

### (2) Reason for the Delay

With respect to the reasons for the delay, a defendant bears the burden of presenting *prima facie* evidence that the delay was caused by the neglect or willfulness of the prosecution. *Spivey*, 357 N.C. at 119, 579 S.E.2d at 255. "Only after the defendant has carried his burden of proof by offering *prima facie* evidence showing that the delay was caused by the neglect or willfulness of the prosecution must the State offer evidence fully explaining the reasons for the delay and sufficient to rebut the *prima facie* evidence." *Id.*

We have held that " '[t]he constitutional guarantee does not outlaw good-faith delays which are reasonably necessary for the State to prepare and present its case. . . . The proscription is against purposeful or oppressive delays and **those which the prosecution could have avoided by reasonable effort.**' " *State v. Hammonds*, 141 N.C. App. 152, 160, 541 S.E.2d 166, 173 (2000) (citation omitted) (emphasis added), *cert. denied*, 536 U.S. 907, 153 L. Ed. 2d 184 (2002).

Likewise, in *Spivey*, the defendant asserted that a four-and one-half-year pretrial delay was caused by the State's "laggard perform-

ance," but the record revealed that the delay was actually the result of a "neutral factor"—docket congestion in Robeson County. *Spivey*, 357 N.C. at 117, 579 S.E.2d at 256. The Court concluded that the defendant had failed to carry his burden of proof in establishing State neglect. In holding that the defendant had not been deprived of his right to a speedy trial, our Supreme Court reasoned:

> Defendant has failed to present **any** evidence that the delay was caused by the State's neglect or willfulness, and **we see no indication that court resources were either negligently or purposefully underutilized.** Indeed, **defendant relies solely on the length of delay** and ignores the balancing of other factors.

*Spivey*, 357 N.C. at 121, 579 S.E.2d at 256 (emphasis added). *See also Hammonds*, 141 N.C. App. at 160-61, 541 S.E.2d at 173-74 (holding that where a four-and-one-half-year-pretrial delay was caused by docket congestion in Robeson County and other "neutral factors," defendant failed to carry his burden of proof in showing State neglect or willfulness).

The case *sub judice*, however, is distinguishable from both *Spivey* and *Hammonds*, as the record contains overwhelming evidence that the actual reason for the delay in this case was not a neutral factor, but rather, was repeated neglect and underutilization of court resources on the part of the Durham County District Attorney's Office. The State has failed to rebut this showing, and we must weigh this factor in favor of defendant.

### Failure to submit evidence to SBI for analysis

First, the record shows that much of the delay was caused by the State's failure to submit its physical evidence to the SBI lab to be examined.

Defendant was arrested on 30 May 2002, indicted on 19 August 2002, and was held in the Durham County Jail for 366 days, pending SBI analysis of the physical evidence. The record shows that from 26 August 2002 to 7 May 2003, defendant moved the court four times to reduce defendant's bond, which was originally set at $1 million. With each motion, the trial court incrementally reduced defendant's bond and directed the State to proceed with the testing as expeditiously as possible.

By 20 July 2006, the case had appeared on at least three trial calenders, but was continued at the request of the State because the SBI

had not performed the necessary tests on the evidence. Thus, it is clear that at least 49 months of the delay, from 30 May 2002 to 20 July 2006, is attributable to the State's continuances, pending SBI testing of the evidence.[1]

According to SBI lab reports, however, the black purse, containing three exclusionary fingerprints, and the black toboggan, containing exclusionary DNA evidence, were not submitted to the SBI lab for analysis until 4 August 2005, which was more than three years after these items were collected.

Moreover, Natassha Robinson, the forensic scientist who conducted the latent print examination and comparison on the shotgun, PDA, and purse, testified at trial that while the State submitted the PDA and shotgun for testing in June and July of 2002, respectively, the State did not submit any fingerprint impressions from defendant for comparison. Lab reports show that defendant's fingerprint impressions were obtained from the SBI's internal system on 31 August 2005.

With the exception of the fecal matter, which could not be tested, the lab reports show that all of the items that were submitted to the lab in June or July of 2002 had been analyzed by 20 October 2003. Most of these items were fully analyzed within six months of their submission. Thus, the primary reason that the SBI did not complete its analysis of the State's evidence until January of 2006 was not a neutral factor, but rather, was a factor wholly within the prosecution's control: the prosecution's failure to submit the evidence to the lab prior to August of 2005.

### Failure to make appropriate requests

Next, the record reveals that during the prosecution, the State was given notice of evidence tending to establish the guilt of another person already in custody, yet the State failed to request that the SBI make appropriate comparisons of the evidence to this person.

On 23 October 2003, defendant moved to compel SBI analysis of the State's physical evidence on the grounds that another person, Lawrence Hawes, had been arrested as a suspect in a string of home invasions in or near the Trinity Park neighborhood of Durham, including six home invasions that occurred *after* defendant's 30 May 2002 arrest:

---

1. On 20 July 2006, defendant continued trial to 18 September 2006, a two-month delay, which we attribute to defendant and do not weigh against the State.

STATE v. WASHINGTON

[192 N.C. App. 277 (2008)]

8. Based on information and belief, the Durham Police Department formed a Sexual Assault Task Force to deal with a series of sexual assaults and burglaries occurring over the last year and a half;

9. [T]hese attacks were occurring in the neighborhoods commonly referred to as **Trinity Park**, Watts-Hillandale, Walltown and Duke University's East Campus;

10 On or about September 13, 2002 **Lawrence Hawes** was arrested by the Durham Sexual Assault Task Force and charged with burglary and sexual assault offenses;

11. . . . **Lawrence Hawes** was a suspect, according to the Durham Sexual Assault Task Force, in the following burglary and/or sexual assaults:

a. January 10, 2002, 400 block of **Gregson St.**

b. February 20, 2002, 600 block of Buchanan St.

c. March 7, 2002, Englewood Ave.

d. April 1, 2002, Priscillas on Guess Rd.

e. July 1, 2002, 800 block of Wilkerson Ave.

f. August 17, 2002, 1400 block of Carolina Ave.

g. September 5, 2002, 800 block of Wilkerson Ave.

h. August 7, 2002, 1100 block of Iredell St.

i. . . . August 17, 2002, Knox St.

j. . . . August 23, 2002, 1400 block of Carolina Ave.

        * * * *

14. Based on information and belief, **Lawrence Hawes would follow females to a residence late at night** or in the early morning hours, pull a weapon and sexually assault the female;

        * * * *

18. [T]he State Bureau of Investigation has not compared the fingerprints or DNA samples of the defendant to any of the evidence recovered by the Durham Police . . .;

19. Nor has the State Bureau of Investigation compared the known fingerprints and DNA samples of Lawrence Hawes to the

evidence recovered by the Durham Police as related to the burglary and assault at 911 N. Gregson St[.]

Because it is referenced in the record of appeal and is material to the issue of state neglect, we take judicial notice that Lawrence Hawes was convicted on 4 June 2003 for acts committed during a home invasion in the Trinity Park neighborhood of Durham on 7 March 2002. *State v. Hawes*, No. COA03-1417, 2004 N.C. App. LEXIS 1286, at 1, 2 (N.C. Ct. App. July 20, 2004), *cert. denied*, 360 N.C. 71, 623 S.E.2d 777 (2005); *see* 1-2 *Brandis and Broun on North Carolina Evidence* § 26 (2004) ("An appellate court may notice its own records."); *see, e.g., West v. Reddick, Inc.*, 302 N.C. 201, 203, 274 S.E.2d 221, 223 (1981) (taking judicial notice of the facts of a North Carolina Court of Appeals decision and concluding that an opinion of the North Carolina Court of Appeals is a "readily accessible source of indisputable accuracy"); *In re Trucking Co.*, 285 N.C. 552, 557, 206 S.E.2d 172, 176 (1974) ("The Supreme Court will take judicial notice of its own records.").

In *Hawes*, the State's evidence tended to show that on 7 March 2002, Lawrence Hawes, a black male, wore a maroon bandana over his nose and mouth and pointed a sawed-off shotgun at the victim before raping and robbing her. *Hawes*, slip op. at 1, 2. Lawrence Hawes' DNA profile was a match to the DNA recovered from the victim's pajama bottoms. *Id.* Hawes' shoe print matched a print recovered from the scene of another nearby home invasion and sexual assault that occurred on 5 September 2002. *Id.* Upon arresting Hawes, police recovered a semi-automatic handgun, four types of hats, four shirts, a bandana, and a toolbox from Hawes' car. *Id.*, slip op. 4. Lawrence Hawes was sentenced to three consecutive terms of 384 to 470 months' imprisonment, and we found no error by the trial court. *Id.*, slip op. 1.

The record shows that despite defendant's 2002 request, the State never submitted a request to the SBI lab that any of the physical evidence in this case be compared to the known fingerprints or DNA profile of Lawrence Hawes, and the trial court denied defendant's motion to compel such testing.[2] Forensic Scientist Natassha Robinson testified that it is SBI policy that where a suspect has been

_____

2. Although the trial court later granted defendant's 2004 motion to compel testing, the 2004 motion makes no reference to Lawrence Hawes. We have no explanation as to why defense counsel did not renew his 2002 request to have the physical evidence compared to the DNA profile and fingerprint impressions obtained from Hawes nor why he failed to introduce this evidence at trial.

identified, latent fingerprint impressions will not be compared to those contained in the AFIS system unless the State specifically makes such a request. Because the State did not make a request for such a comparison, the fingerprints obtained from the purse, which did not match defendant, were not run through the system for comparison. Likewise, the State did not request that the mixture of DNA profiles obtained from the toboggan, none of which matched defendant, be queried against the convicted offender indexes of the NCSBI State Database. We conclude that the State's failure to request that such comparisons be made is evidence of the State's repeated neglect of this case over the course of the prosecution.

### Underutilization of court resources

Finally, the record shows that for nearly two years the Durham County District Attorney's Office failed to notify the SBI that it had been court ordered on 18 March 2004 to analyze the evidence; as such, the SBI lab did not comply with the order and did not conduct all of the tests mandated by Judge Stephens. As previously discussed, we note that even if the State had provided the SBI with a copy of Judge Stephens' Order in 2004, the SBI could not have tested the purse or toboggan at that time because the State did not submit those items to the lab for examination until August of 2005.

The 18 March 2004 order mandated that the SBI conduct eight types of tests on the evidence and that if any of those tests could not be performed, that the agency provide Assistant District Attorney Tracy Cline with a written statement explaining the reason that any such test could not be performed. At trial, Special Agent Jennifer Elwell of the SBI testified to the following:

Q. Is there in [the SBI files on the case] a Court Order signed on the 18th day of March, 2004, ordering the SBI to perform certain tests?

A. **No, sir, there is no Court Order in either file.**

Q. So [to] your personal knowledge, no one from the Durham Police Department contacted you and let you know sometime after the 18th day of March, 2004 that the SBI was under Court Order to perform certain tests?

A. I'm going to refer right now to my phone logs, not my phone logs, but the phone logs that were generated in this case, and see if there is any kind of telephone conversation. **It is our**

STATE v. WASHINGTON

[192 N.C. App. 277 (2008)]

**standard operating procedure that if a conversation had occurred we would have written it down in the phone log.**

\* \* \* \* .

**A. No, sir, there is no indication of a phone conversation regarding a Court Order.**

Q. From the Durham Police?

A. No.

Q. Or the Durham County District Attorney's Office?

A. That would be correct.

(Emphasis added.)

In total, four different SBI agents—Jennifer Elwell, Michael Joseph Budzynski, Natassha Robinson, and James Gregory—testified that they were not provided with notice of the 2004 court order. Detective Smith of the Durham Police Department also testified that he never received a copy of the order compelling testing, and he had no notice of it.

Moreover, despite the 2004 order that the SBI conduct STR/DNA analysis of the bandana and make appropriate comparisons to defendant, the lab report shows that the State never requested such a test. Accordingly, the SBI only conducted a hair analysis of the bandana and never examined the bandana for the presence of DNA. Thus, even with more than four-and-one-half years of time to prepare its case, the State failed to completely analyze the evidence as ordered.

In sum, the State's three-year delay in submitting the evidence to the SBI lab, its failure to request that such evidence be compared to the AFIS Database and convicted offender indexes of the NCSBI State Database, and its failure to notify the SBI that it had been court ordered to conduct tests necessary for its prosecution is *prima facie* evidence of State neglect and underutilization of court resources during the course of this prosecution. Defendant has carried his burden of proof.

In response, the State argues that the length of time that it took the SBI to test the items of evidence was outside of the prosecution's control. Likewise, at trial, Assistant District Attorney Cline testified that it can take "years" for the SBI to fully test an item. This assertion, however, is simply unsupported by the evidence of record. According

to SBI lab reports, all of the items were tested within one year and four months of their submission and most were tested within six months of their submission.

In addition, the State contends that much of the delay was caused by the fact that the fecal matter could not be tested; however, the State has not submitted any evidence to support this contention. To the contrary, SBI Agent Michael Joseph Budzynski testified at trial that because the SBI lab does not conduct DNA analysis on fecal matter submitted in a plastic bag, upon receiving a fecal sample in that form, the SBI lab would have immediately advised the State that such evidence would not be analyzed.

In sum, there is no evidence in the record tending to show that the delay was caused by a factor outside of the prosecution's control, such as a short staff or backlog of evidence to be tested at the SBI lab. This distinguishes the instant facts from the facts of *Spivey* and *Hammonds*. Because the State has failed to rebut defendant's *prima facie* showing that the majority of the delay was caused by the State's neglect and underutilization of court resources throughout the course of this prosecution, we must weigh this factor in favor of defendant.

(3) Defendant's Assertion of His Right to a Speedy Trial

We turn to the third factor. The United States Supreme Court has stated:

> Whether and how a defendant asserts his right is closely related to the other factors . . . . The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain.

*Barker*, 407 U.S. at 531, 33 L. Ed. 2d at 117.

Here, defendant formally asserted his right on 24 June 2005, when he moved to dismiss the case on the grounds that the State had deprived him of his right to a speedy trial. While this was roughly two years and ten months after his August 2002 indictment, it was also approximately one year and eight months before his trial began.

In addition, although not a formal assertion of defendant's right, in order to reduce the delay, defendant moved the court twice to com-

pel testing by the SBI. Defendant made his first motion on 23 October 2002, just roughly two months after his indictment; he moved the trial court again on 18 March 2004, stating:

> [T]he Defendant believes the tests [sic] results will prove he had no contact with any of the collected items, has never been inside the residence at 911 N. Gregson St., did not assault any of the victims and is completely innocent of these charges.
>
> Wherefore the Defendant requests that the Court enter an Order compelling the SBI to proceed with the examinations requested in paragraph seven (7) above **as soon as practicable.**

(Emphasis added.)

Finally, defendant complained about the delay at trial by cross-examining all of the State's witnesses from the SBI about the reason for the delay and by calling Assistant District Attorney Cline to the stand to testify to the same effect.

Thus, while defendant's formal assertion of his right was not immediate, he did assert this right almost two years prior to the start of his trial. Further, defendant began informally asserting his right as early as October of 2002, when he began moving the court to expedite SBI testing. Defendant continued to complain about the delay throughout his prosecution. Accordingly, when considered together, these actions weigh in favor of defendant.

### (4) Prejudice to Defendant

Finally, we consider whether defendant has suffered prejudice as a result of the delay of his trial. "Courts will not presume that a delay in prosecution has prejudiced the accused. The defendant has the burden of proving the fourth factor." *State v. Hughes*, 54 N.C. App. 117, 120, 282 S.E.2d 504, 506 (1981). Nevertheless, the need to demonstrate prejudice diminishes as the egregiousness of the delay increases. *Doggett*, 505 U.S. at 668, 120 L. Ed. 2d at 532.

As to this factor, the United States Supreme Court has recognized three objectives of the right to a speedy trial: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532, 33 L. Ed. 2d at 118 (citation omitted). Of these forms of prejudice, the most serious is the last, as "the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

STATE v. WASHINGTON

[192 N.C. App. 277 (2008)]

Here, there is evidence that the near five-year pretrial delay resulted in actual particularized prejudice to defendant, which we must weigh heavily in defendant's favor.

## Pretrial incarceration

First, defendant was incarcerated for more than 366 days prior to his trial. While evidence of a lengthy pretrial incarceration, standing alone, may be insufficient to establish that a defendant's right to a speedy trial has been violated; see Spivey, 357 N.C. 114, 579 S.E.2d 251; and Hammonds, 141 N.C. App. 152, 541 S.E.2d 166, our Supreme Court has nonetheless stated that evidence of an oppressive pretrial incarceration is an important consideration in our analysis. Webster, 337 N.C. at 681, 447 S.E.2d at 352. "[T]ime spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness." Barker, 407 U.S. at 532, 33 L. Ed. 2d at 118. Here, there is evidence that the pretrial incarceration not only disrupted defendant's work as an auto mechanic, but also disrupted his family life. At 3:00 p.m. on the afternoon following defendant's arrest, police found defendant's ten-year-old son home alone in defendant's apartment. The record does not reveal who took custody of his son during defendant's incarceration; however, defendant's sudden separation from his child, which lasted for more than a year, is a form of prejudice that we must consider.

## Impairment to the defense

As a preliminary matter, we note that evidence tending to establish that another person committed the crime for which a defendant is charged is relevant and admissible as long as it does more than create an inference or conjecture in this regard. State v. Israel, 353 N.C. 211, 219, 539 S.E.2d 633, 638 (2000). It must tend to both implicate another and be inconsistent with the guilt of the defendant. Id. Thus, the evidence referenced in defense counsel's 2002 motion, that another person, Lawrence Hawes, had been convicted of invading another home in the same Trinity Park neighborhood, while carrying the same type of weapon and wearing the same type of disguise, just two months prior to the date of the offenses for which defendant was charged would have been relevant and admissible evidence at trial. Because we see no tactical advantage in excluding this evidence from the jury's consideration, we find that defense counsel's failure to introduce this evidence was likely inadvertent. We recognize, as a practical matter, that over the years that passed between defense counsel's 2002 motion to compel testing and defendant's 2007 trial,

STATE v. WASHINGTON

[192 N.C. App. 277 (2008)]

defense counsel may have simply forgotten about or overlooked this evidence; however, without an explanation in the record, we will not attribute this omission to the delay. Thus, while the fact that this evidence was not introduced at trial was clearly prejudicial to defendant, we do not weigh this prejudice against the State under our *Barker* analysis.

What we do weigh against the State, however, is the clear impairment to the defense caused by the inability of many of the witnesses to recall details pertinent to the defense. *See Barker*, 407 U.S. at 532, 33 L. Ed. 2d at 118 ("There is also prejudice if defense witnesses are unable to recall accurately events of the distant past."). Here, the trial transcript reveals that the witnesses' inability to accurately recall the events of 30 May 2002 repeatedly interfered with defendant's ability to establish circumstantial evidence that was relevant to the defense and also impeded defendant's ability to challenge the reliability of the State's identification evidence on cross-examination. Given that all of the evidence tending to establish defendant's guilt in this case was testimonial in nature, the impairment to the defense here was more pronounced than it might have been otherwise.

First, in establishing defendant's guilt, the State relied heavily on the testimony of Durham Police officers concerning the circumstances of defendant's arrest. Since it had been nearly five years since defendant's arrest, however, officers could recall very little beyond what was recorded in their notes. There were several instances at trial where the defense inquired about facts that were not contained in police reports, but were relevant to the defense, and the officers stated that they did not recall.

For instance, the defense's ability to highlight any discrepancies between defendant's physical characteristics and the description of the intruder that was given to law enforcement was repeatedly impeded by the inability of the officers to recall details of the description that had not been recorded in their notes. This is just one example:

Q. You indicated that Officer Caldwell gave out a description of this person who had been in the house with the shotgun?

A. Uh-huh.

Q. What was that description?

A. The description was a black male with a shotgun. I think he said blue T-shirt and jeans.

STATE v. WASHINGTON

[192 N.C. App. 277 (2008)]

Q. Did the person that gave out the initial description say anything about his height?

A. **I don't recall.**

Q. Did they say anything about the person's weight?

A. **I don't recall that either.**

(Emphasis added.)

Likewise, another fact relevant to the defense was that approximately $150 was missing from Mrs. Breeze's purse, yet police reports did not show that defendant had any money in his pockets at the time of his arrest. While the omission in the reports tended to imply that defendant was not carrying the cash, this fact was not affirmatively documented and not one officer was able to testify with certainty as to this fact. For example, relying on memory alone, Detective Anthony Smith suggested, but could not say definitively that defendant did not have any cash on him at the time of his arrest:

Q. Was [sic] there [] property forms filled out for Frankie Washington?

A. There was [sic] some.

Q. How many?

A. I don't know the exact amount. There are other means of identifying where property is also.

Q. All right. Can you tell this jury, if a property report was done on any money that was taken from Frankie Washington the night he was arrested or early morning hours he was arrested?

A. No. No.

Q. Do you remember of your own personal knowledge whether he had any money on him at all?

A. **I do not recall him having any money on him.**

(Emphasis added.)

Next, the crux of the State's evidence establishing defendant's guilt was eyewitness testimony, including Mr. and Mrs. Breeze's pretrial show-up identification of defendant as the perpetrator of the crime and three in-court identifications to the same effect. The victims' blurred recollections as to the details of 30 May 2002

repeatedly interfered with defendant's ability to challenge the reliability of those identifications.

For example, defendant's opportunity to challenge the reliability of Mr. Breeze's pretrial identification of defendant as the perpetrator of these crimes was severely hindered by Mr. Breeze's inability to recall the details of the 30 May 2002 identification procedure:

Q. So when they told you they had a suspect, you knew that before you even left the house, is that right?

A. I knew that they were going to drive me somewhere to show me someone, yes.

Q. And when they drove you to where this person was, you were in the back of a police car, is that right?

A. Yes, that's correct. **I think that's right**, yeah. I was in a police car.

Q. Think about it for a minute. Were you in the back of the police car?

A. Yes.

* * * *

Q. How many people were sitting on the front seat in front of you?

A. Well, there was the driver, and I believe **there might have been somebody else,** but I'm not a hundred percent sure I wasn't there and the other guy in the backseat, but **I think I was sitting beside my wife.**

Q. And you're looking out through the front window of the police car, is that right?

A. **I think it was the side, I'm not sure. I looked out the window.**

Q. **How far was the police car away from this person you were looking at?**

A. **Close enough** that I could see him real well. . . .

Q. How far away were you, Attorney Breeze?

A. **I don't know.** I mean it was not too far.

* * * *

Q. So you're saying maybe back to that first row is how far away you were?

A. **Well, you know, I don't know.** I mean it wasn't all that far because I could see him.

(Emphasis added.)

It seems from the outcome of the case that the jury did not weigh Mr. Breeze's faded memory heavily against him; however, Mr. Breeze's inability to recall the conditions under which he identified defendant as the perpetrator of the offenses at issue, including the distance from defendant at which he made such identification, made it substantially more difficult for defendant to challenge Mr. Breeze's opportunity to accurately see defendant's facial features and to contest the reliability of that identification. This was prejudicial to defendant.

Finally, we turn to the fact that the victims in this case were permitted to participate in several in-court identifications nearly five years after the date of the crime.[3] Without addressing whether it was proper to admit such identification evidence, we note that the "reliability of identification evidence is the linchpin in determining its admissibility." 29 Am. Jur. 2d Evidence, § 637 (2008). For both in-court and out-of-court identifications, there are five factors to consider in determining whether an identification procedure is so inherently unreliable that the evidence must be excluded from trial: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty

---

3. While we are troubled by the the Durham Police Department's use of a highly suggestive show-up procedure to identify defendant as the perpetrator of this crime, defendant did not move to suppress this pretrial identification evidence at trial nor does he argue on appeal that admission of this evidence amounted to plain error; accordingly, the question of whether the trial court's admission of that evidence constitutes reversible error is not before us for review. N.C. R. App. P. 10(b)(1) (2008). Likewise, while defendant did object to the victims' in-court identifications of defendant pursuant to Rule 403 of the N.C. Rules of Evidence, defendant has abandoned this assignment of error on appeal. N.C. R. App. P. 28(b)(6) Art. II. Thus, for purposes of our *Barker* analysis, we assume *arguendo*, that the trial court's admission of the pretrial identification evidence and in-court identification evidence does not constitute reversible error. *But cf. State v. Pinchback*, 140 N.C. App. 512, 518, 537 S.E.2d 222, 225 (2000) (reversing on the grounds that pretrial identification evidence should have been excluded where the identification procedure was a suggestive show up; the witness was only in the presence of an unmasked perpetrator for a period of thirty minutes, most of which time the witness's back was turned towards the perpetrator; and the witness only accurately described the perpetrator's clothing).

demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.; see also Pinchback*, 140 N.C. App. at 518, 537 S.E.2d at 225. Thus, we have recognized that the longer the length of time between the crime and the in-court confrontation, the greater the likelihood of misidentification, and likewise, the greater the prejudice to defendant from admission of such identification evidence.[4]

In May of 2002, Mrs. Breeze could only identify the color of the intruder's shirt and that it had some sort of white insignia on the front and back of it. At trial in 2007, she was asked whether a photo of defendant's blue shirt depicted the same exact blue shirt that she had seen nearly five years earlier. Similarly, Will Breeze and Mr. Breeze, who testified that they had only seen a slice of the intruder's face for less than ten to fifteen minutes in May of 2002 and who had never seen the intruder before that time, were asked to identify whether defendant was the same person they had seen nearly five years before. These in-court identifications were substantially more likely to result in a misidentification of defendant as the perpetrator of the crimes charged than if they had been conducted sooner in the process.

In sum, it is clear from the record that the near five-year pretrial delay resulted in actual particularized prejudice to defendant, including an oppressive 366-day pretrial incarceration, the loss of circumstantial evidence surrounding defendant's arrest, impairment to the defense's ability to challenge pretrial identification evidence, and a substantially greater likelihood that the in-court identifications would result in misidentification of defendant as the perpetrator of the offenses. Accordingly, we must weigh this prejudice heavily in defendant's favor.

Given the length of the delay, defendant's repeated efforts to expedite his trial, the overwhelming evidence that the delay could have been avoided if the State had exercised even the slightest care during the course of this prosecution, and the fact that this delay actually prejudiced defendant at trial, there is not one *Barker* factor that weighs in favor of the State. Therefore, after applying the *Barker*

---

4. For future reference, we note that in an effort "to help solve crime, convict the guilty, and exonerate the innocent in criminal proceedings by improving procedures for eyewitness identification of suspects," the General Assembly has enacted the Eyewitness Identification Reform Act. N.C. Gen. Stat. § 15A-284.51(2007). Because this legislation became effective on 1 March 2008, it is not applicable to the case *sub judice*.

balancing test to the exceptional and unprecedented facts of this case, we have no choice but to conclude that defendant has been deprived of a right specifically affirmed in both our state and federal constitutions. As such, we must vacate defendant's convictions and dismiss all charges with prejudice.

Because we dismiss all charges with prejudice on speedy trial grounds, we need not address defendant's remaining assignments of error.

Vacated and dismissed.

Judges TYSON and STROUD concur.