IN THE SUPREME COURT OF NORTH CAROLINA

No. 334A21

Filed 1 September 2023

STATE OF NORTH CAROLINA

v.

SINDY LINA ABBITT and DANIEL ALBARRAN

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 278 N.C. App. 692 (2021), finding no prejudicial error in defendants' trial, resulting in judgments entered on 13 March 2019 by Judge Lori I. Hamilton in Superior Court, Rowan County. Heard in the Supreme Court on 27 April 2023.

*Joshua H. Stein, Attorney General, by Laura H. McHenry, Special Deputy Attorney General, for the State.*

*Anne Bleyman for defendant-appellant Sindy Lina Abbitt.*

*M. Gordon Widenhouse, Jr. for defendant-appellant Daniel Albarran.*

MORGAN, Justice.

This appeal concerns the admissibility of defendants' proffered evidence which they asserted would tend to show that two other individuals—not defendants—had committed the crimes for which defendants were being tried and that defendants themselves were not involved. We agree with the trial court's determination that the evidence in question did not meet the pertinent relevancy requirements for the

admissibility of such evidence. Accordingly, we affirm the portion of the decision of the Court of Appeals at issue before us which upheld the trial court's ruling that defendants' evidence which speculatively imputed blame for the charged offenses to other potential suspects could not be presented to the jury.

## I. Background

### A. Factual and trial history

In 2016, defendants were charged with first-degree murder, attempted robbery with a dangerous weapon, and assault with a deadly weapon. The two were tried jointly in a non-capital proceeding. The charges brought against defendants arose from crimes that were committed in Salisbury on the night of 24 May 2016. The evidence at trial tended to show the following: Mary Gregory was in the living room of her apartment with her three-year-old grandson Meaco when Lacynda Feimster—Gregory's daughter and Meaco's mother—returned from work. When Feimster entered the apartment, she was accompanied by a Black woman and followed by a Hispanic[1] man. The woman was carrying a black gun with a brown handle. At trial, Gregory testified that neither of the persons with Feimster was known to her. After telling Gregory, "I got this," Feimster entered her bedroom with the woman and closed the door. After Meaco began to cry, Feimster and the woman opened the bedroom door and allowed Meaco to go into the room to join his mother.

---

[1] This is the term utilized by the parties and witnesses at trial to describe the racial background of the male perpetrator.

As the man sat in the living room with Gregory, he refused to tell Gregory his name or where he lived when she attempted to engage him in conversation. The man took Gregory's cellular telephone away from her when Gregory attempted to call Feimster's teenage daughter to come take Meaco away from the apartment. Gregory described the man as tall, with wavy black hair that was combed or slicked back. She did not mention any facial hair or visible tattoos on the man. Gregory also stated that the man was wearing a long-sleeved jacket, a white T-shirt, and white low-top tennis shoes. He also had on "dirty looking" latex gloves.

Gregory testified at trial that during the time that the criminal perpetrators were in her home, the man opened the front door of the apartment several times, looking outside; he also made several telephone calls, including one in which Gregory heard the man say to an unknown person, "She wants to know how far you are. Where are you? How far away are you?" After the call, the man went to the bedroom in which his female accomplice, Feimster, and Meaco were located. The woman told Gregory to enter the bedroom. Feimster and Meaco were seated on Feimster's bed. The woman briefly left the bedroom. Upon her return, she struck Gregory in the face with the gun, knocking Gregory to the floor and ordering Gregory to "stay down." Gregory described the woman as short, stocky, and dark-skinned, having shoulder-length hair and wearing red tennis shoes. Gregory testified that the woman seemed to be in charge, continually telling the man what to do. The woman told the man to search the bedroom, but upon doing so, the man apparently did not discover the item or items

being sought. The man then left the bedroom. Feimster then stated to the woman, "If I had it, I would give it to you. I don't have any money." Gregory also informed the woman that Feimster did not have any money. The woman forced Feimster to the floor. Feimster curled around Meaco "in a fetal position" with the female perpetrator using her knee and her hand to keep Feimster on the floor. The woman said to Feimster, "Bitch, you should have gave [sic] me the mother fucking money," shot Feimster in the head, and ran out of the apartment. Gregory used a telephone to call the emergency telephone number 911 for help, but Feimster died as a result of the gunshot wound. An autopsy showed that Feimster had also suffered blunt force trauma to the head before her death. Gregory received eight stitches to her face and suffered a broken nose. Meaco escaped the incident without sustaining physical injury.

Defendants were identified as suspects in the crimes, including Feimster's killing.[2] Approximately three days after the commission of the offenses, Gregory identified both defendants as the perpetrators with one hundred percent certainty through the usage of photographic lineups. Gregory identified defendants again during the investigation by law enforcement as well as at trial. On cross-examination of Gregory at trial, counsel for defendant Abbitt asked Gregory if Gregory's

---

[2] Given the limited focus of the issue before the Court, we omit a detailed recapitulation of evidence produced at trial regarding the investigation and the charged crimes, as such material pertains to matters outside of the issue presented by defendants' proffered evidence.

granddaughter JaQuela Green had shown Gregory a picture of a woman named Ashley Phillips. Gregory responded that neither JaQuela nor anyone else had shown Gregory such a picture.

At a hearing conducted on 7 March 2019, outside of the presence of the jury, the State announced that it "had filed a motion in limine to [ex]clude the mention of possible guilt[ ] of another"[3] in light of defendants' opening statements and some of the questions posed to Gregory upon cross-examination by defense counsel. The State's motion in limine was premised upon the State's position that for any evidence to be relevant and admissible with regard to the suggestion or insinuated culpability of someone other than defendants of criminal wrongdoing, the evidence of the guilt of another must both "point directly to the guilt of the other party and be inconsistent with the guilt of the defendant[s]." The State contended in its motion that defendants' proffered evidence did not satisfy the second prong of this relevancy test.

In divulging their proffered evidence to the trial court in response to the State's motion in limine, trial counsel for defendants explained that, in defendants' view, the police had failed to conduct a thorough investigation of two other people who should be considered as the perpetrators of the crimes at issue. Through their counsel, defendants represented that, during the investigation by the Salisbury Police

---

[3] The trial transcript indicates that the State sought to "*include* mention of possible *guilt* [ ] of another," (emphases added), but the context of the parties' arguments and the trial court's ruling makes clear that either the prosecutor misspoke or the court reporter misheard these remarks.

Department (SPD) of Feimster's murder, a Black woman named Ashley Phillips was identified by a member of Feimster's family as a potential suspect. In appearing for her interview by officers at the police station, Phillips arrived in a car which matched the description provided by a confidential informant of a vehicle that was present at the apartment complex where Gregory resided on the day of Feimster's killing.[4] In the car in which Phillips rode to her police station interview, officers discovered a .25 caliber gun—"the same caliber of gun that the shell casing at the scene came from"— and white latex gloves similar to the type of latex gloves that Gregory testified that the male perpetrator was wearing.[5] Although police did not conduct a photographic lineup with Gregory that included a picture of Phillips, when Gregory ultimately was shown a photograph of Phillips, Gregory said, "Well, she does look like her," referring to the woman who had shot Feimster. Defense counsel reasoned that Gregory's identification of defendants could be called into question. Finally, trial counsel for defendant Albarran asserted that under the State's theory of the case, "if one [defendant] is guilty[,] the other [defendant] is guilty. . . . without one, there's not the other," such that "Albarran's defense . . . dovetails on [ ] Abbitt's defense."

---

[4] Counsel for defendant Abbitt represented that the confidential informant reported that the source saw a Black female arrive at the apartment complex "before the time of the murder" in "a tan Honda . . . . Accord."

[5] The record does not reflect the context for the law enforcement officers' discovery of these items; *e.g.*, whether Phillips consented to a search of her vehicle or whether officers obtained a warrant. According to the State, however, Phillips and some of her friends knew through social media outlets that they might be suspects in the crimes and voluntarily went to the police station in order to clear their names.

Defendants further theorized that the man who accompanied Phillips as the second individual who committed the criminal acts at issue was known as Tim Tim McCain. McCain and Phillips were commonly associated with one another according to defendants, and although the confidential informant did not place Phillips in the area where the crimes occurred at the same time that they were committed, nonetheless McCain could have been the male perpetrator because he was observed in the vicinity of Gregory's apartment with a woman who resembled Phillips near the time of the perpetration of the crimes. Hence, defendants argued that the woman and the man who performed the criminal acts at issue were not the two of them, but instead were the duo of Phillips and McCain.

In addition to its interpretation of the cited legal principles which govern this area of the law, the State relied upon its perceived certainty and consistency of Gregory's identification of defendants as the wrongdoers, contending that "Gregory is very clear about the two individuals she saw inside of her home when this incident occurred."

After listening to the arguments of the parties, reviewing the State's motion, and consulting the case citations on relevancy provided by defendants, the trial court cited *State v. Cotton*, 318 N.C. 663, 667 (1987) for the legal concept that evidence of the guilt of others must be relevant under Rule of Evidence 401 *and* "must tend both to implicate another and be inconsistent with the guilt of the defendant." "[T]aking the evidence in the light most favorable to the State, at this point," the trial court

ruled that the proffered evidence "failed to meet that second prong" because it was not "inconsistent with the defendant[s'] guilt" and thus granted the State's motion in limine.

After the trial court's ruling in open court on the State's motion in limine but before the trial court orally announced its findings of fact, defense counsel queried the trial court as to whether, in accord with the allowance of the State's motion in limine, the defense could elicit testimony about items being seized from a car that did not belong to either defendant and about whether the items were tested as part of the investigation of the crimes. This inquiry was harmonious with defendants' position that the SPD conducted a questionable and incomplete investigation into Feimster's murder and related crimes. Specifically, defense counsel for Abbitt asked:

> So without mentioning the other person, are we allowed to elicit testimony such as a car arrived at the police station, and that car had a .25 caliber firearm and latex gloves, and that [ ] Abbitt was not in that vehicle, and that there was DNA swabs taken from that firearm, the firearm was retrieved, it was returned. Are we allowed to ask all of those things because it's part of the investigation as long as we don't bring up [ ] Phillips or ?[6]

The trial court responded that such information would be irrelevant and hence inadmissible with regard to the issue of other potential suspects, based upon the cited application of the second prong of relevancy. Counsel for defendant Abbitt then noted that Officer Young of the SPD had been asked by defendant Albarran's counsel on

---

[6] No second name was stated by counsel.

cross-examination during the previous day's proceedings "about the latex gloves, the holster and the firearm that was seized from that vehicle, so I would ask to at least be able to question about those since the State didn't object at the time."

Defendant Albarran's counsel thereupon stressed the importance of the defense's ability to cross-examine the State's witnesses about items seized during the investigation of Feimster's murder, with particular emphasis on whether such items were tested or analyzed and the reasons for those decisions. Such a presentation was deemed to constitute an essential ingredient of the efforts by defense counsel in showing that the SPD did not conduct a thorough and appropriate search for the actual perpetrators of the crimes and in "impeaching the quality of the investigation." The trial court then ruled:

> I think you can question about the thoroughness of the investigation. I'll allow you to do that, but we're not going to go into whose car was that found in? "Who did it belong to? Why—you know, you—you can always ask: Why didn't you test it? Did you test it? If you didn't, why didn't you test it?" But we're not going to go any further down that road.

The parties and the trial court next discussed whether the results of any testing of the items could be explored with witnesses for the State and whether the defense could present its own evidence on this point. Consistent with its ongoing analysis, the trial court observed that a test result of the gun seized from the Phillips vehicle still would not absolve defendants in light of the second prong of the relevancy rule that the evidence "must tend both to implicate another *and* be inconsistent with

the guilt of the defendant." (Emphasis added.) Counsel for defendant Abbitt posited that the confidential informant's report of a Black female in a tan Honda Accord at the apartment complex before the murder, coupled with statements from witnesses in the neighborhood who heard "tires squeal, car doors shut," along with the absence of the tan Honda Accord once SPD officers responded to Gregory's emergency call to the telephone number 911, suggested that there was only one Black woman connected to Feimster's murder, with all of these circumstances fitting Phillips's conceivable criminal involvement. The prosecutor countered that questions regarding testing of the items taken from Phillips's car were the beginning of a "slippery slope" leading toward the issue of alternative suspects. The trial court again set parameters for defendants, instructing defense counsel: "I'm going to let you ask questions about, 'Did you take swabs from the firearm? Did you send them off? Were they tested?' I'll let you ask questions about that, but we're not going to go any further down that road."

A written report from an SPD detective was submitted by defendant Abbitt's counsel as an item of the defense's proffered evidence during the hearing which was conducted on the State's motion in limine. In addressing the matter, the trial court stated the following:

> The informant says that Tim Tim saw they, I assume the informant and somebody else that was with the informant, looking at him, Tim Tim, and recognized him, and he kept walking. But there was an older styled Honda that is very loud and parked up near the mailboxes with a black female inside.

The informant says they didn't get a good look at the female, but they thought she had shortcut hair, had some weight on them and appeared to be possibly light-skinned. The informant says that the female killed the victim at the request of Tim Tim; that Tim Tim couldn't do it because he had been seen by the informant and whoever was with the informant.

The officer asked the informant if several individuals had anything to do with the murder. The informant said he never saw two of the individuals, that he only saw Tim Tim McCain. And he didn't know anything about the—Ashley Phillips, who was one of the persons Detective Sides mentioned. And then he goes on to say that there were people that were beefing including the victim[']s own sister, who was beefing with the victim and had told her sister—I'm not sure who that is.

So I don't know which sister she's—he's referring to, that she wished, apparently, the victim was dead. So this informant is, kind of all over the place. His description of the black female in the vehicle does not seem to match the description of the black female that [ ] Gregory gave. And I don't see that this confidential informant provides any information that would make me reconsider my ruling.

During the evidentiary phase of the trial, the State introduced into evidence cellular telephone data for defendants' devices. Federal Bureau of Investigation Special Agent Michael Sutton, an expert in the field of historical cell site analysis and cellular technology, performed an examination of the data to determine the general location of both of defendants' cellular telephones at various given time periods, along with the number and extent of the contacts between the two cellular telephone numbers of defendants. This technology also enables a cellular telephone's physical location to be approximated based upon the information gathered and stored by

cellular towers which provide service to a cellular telephone when such a device is in the particular tower's area and the cellular telephone registers an incoming or outgoing call or text. Sutton testified that on 24 May 2016, defendants' cellular telephones were both detected by a cellular tower providing service to defendant Abbitt's residence on Adolphus Road from at least 6:09 p.m. to 7:12 p.m. By 7:32 p.m., defendant Albarran's cellular telephone had moved from the Adolphus Road cellular tower service area to the service area of a cellular tower serving the O'Charley's restaurant where Feimster worked. By 10:41 p.m., defendant Abbitt's cellular telephone had moved from the Adolphus Road cellular tower service area to a cellular tower service area that included the Food Lion grocery store where Feimster stopped to make purchases. At 11:02 p.m. and 11:07 p.m., defendant Albarran's cellular telephone was detected by cellular towers which provided service to the O'Charley's and Food Lion sites, as well as Gregory's apartment. By 11:58 p.m., both of defendants' cellular telephones were once again using a cellular tower which provided service to defendant Abbitt's residence. On the following morning of 25 May 2016, both of defendants' cellular telephones were detected by neighboring cellular towers south of Winston-Salem at 10:46 a.m. By 11:07 a.m., both of defendants' cellular telephones were recognized by the same cellular tower south of Lexington. Even though defendants denied knowing one another, there were approximately twelve contacts between defendants Abbitt's and Albarran's cellular telephones from 23 May 2016 through 26 May 2016, albeit none on the 24 May 2016 date of the murder.

Defendants did not present any evidence at trial.

The jury returned guilty verdicts against defendant Abbitt for: (1) first-degree murder on the bases of malice, premeditation, deliberation, and felony murder; (2) attempted robbery with a dangerous weapon; and (3) assault with a deadly weapon. Defendant Albarran was convicted by the jury of (1) first-degree felony murder, (2) attempted robbery with a dangerous weapon, and (3) assault with a deadly weapon. Each defendant appealed.

**B. In the Court of Appeals**

On appeal to the Court of Appeals, defendants presented arguments on a total of six issues: Each defendant appealed the trial court's refusal to allow the admission of evidence to implicate third parties. Additionally, defendant Albarran asserted that (1) the photographic lineup including his photograph was impermissibly suggestive; (2) the trial court erred by overruling his objections to the State's argument that he had failed to present evidence; and (3) his counsel's closing argument was flawed. Defendant Abbitt additionally challenged (1) the admission into evidence of her out-of-court denials that she saw the victim Feimster on the day of the murder and (2) the sufficiency of the indictment to support the charge of first-degree murder. The majority of the panel of the Court of Appeals concluded that no prejudicial error was committed by the trial court with regard to any of the arguments advanced by defendants. *State v. Abbitt*, 278 N.C. App. 692, 694 (2021).

In addressing the only issue in defendants' appeal which has been raised for

this Court's review—the refusal of the trial court to allow defendants to introduce evidence which defendants contend would tend to show that two other people committed the crimes for which defendants were being tried and that defendants were not involved—the Court of Appeals observed that the admissibility of this type of evidence turns on the relevancy of the evidence. *Id.* at 699. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2021). "Evidence that another committed the crime for which the defendant is charged generally is relevant and admissible as long as it does more than create an inference or conjecture in this regard. . . . The evidence must simultaneously implicate another and exculpate the defendant." *State v. Miles*, 222 N.C. App. 593, 607 (2012) (citations and internal quotation marks omitted), *aff'd per curiam*, 366 N.C. 503 (2013). Applying this statutory law and appellate precedent, the majority of the Court of Appeals panel opined:

> Neither [d]efendant proffered evidence tending to *both* implicate another person(s) *and* exculpate either [d]efendant. *Miles*, 222 N.C. App. at 607 . . . (emphasis supplied). The proffered evidence merely inferred another person may have been involved in, or assisted in committing the crimes.
>
> Such inferences, if true, were not inconsistent with direct and eyewitness evidence of either Albarran or Abbitt's guilt. *Id.* Albarran failed to show the trial court's exclusion of the proffered evidence, as not relevant and not admissible, was prejudicial or reversible error.

*Abbitt*, 278 N.C. App. at 700.

One member of the three-judge panel of the Court of Appeals, however, dissented from this portion of the decision of the lower appellate court. As to the admission of evidence regarding other potential perpetrators, the dissenting judge agreed with the majority's identification of the applicable test for the relevancy and admissibility of evidence concerning the prospect that another person may have committed the crime(s) for which a defendant is being tried, but reached a different conclusion about the interpretation of the applicable test when adapted to the case at bar:

> Evidence implicating others is relevant and admissible when it simultaneously implicates another and exculpates a defendant. Defendants sought to provide such evidence that implicated another person and exculpated themselves. The proffered evidence "constitute[d] a possible alternative explanation for the victim's unfortunate demise and thereby cast[ ] crucial doubt upon the State's theory of the case." *State v. McElrath*, 322 N.C. 1, 13-14 . . . (1988). The trial court erred in precluding [d]efendants from introducing evidence implicating other suspects.
>
> Further, a "reasonable possibility [exists] that, had the error in question not been committed, a different result would have been reached." *State v. Miles*, 222 N.C. App. [at] 607 . . . (2012) . . . .

*Id.* at 707–08 (Murphy, J., dissenting in part and concurring in part) (first alteration in original).

On 7 September 2021, defendants filed their notices of appeal pursuant to

-15-

N.C.G.S. § 7A-30(2) (2021). On the same date, defendant Abbitt also filed a petition pursuant to N.C.G.S. § 7A-31(c) (2021) asking this Court to grant discretionary review of additional issues. The petition for discretionary review was denied on 4 May 2022 by order of the Court. Thus, the only issue presented to this Court for resolution concerns the matter raised in the dissenting opinion of the Court of Appeals with regard to whether the trial court properly excluded proffered evidence that persons other than defendants committed the crimes at issue here.

## II. Analysis

The issue to be determined by this Court on the basis of the dissent in the lower appellate court is whether the trial court erred in declining to admit into evidence defendants' proffered evidence which they contend would implicate two alternative people as the perpetrators of the charged offenses and would exculpate defendants as the two individuals who committed the crimes for which defendants were being tried. We conclude that while the excluded evidence demonstrated the possibility of the involvement of other perpetrators, nonetheless it did not serve to also exculpate defendants as this Court has required for such evidence to be deemed as both relevant and admissible. Accordingly, we affirm the portion of the Court of Appeals decision before us, finding no error in this aspect of defendants' trial.

### A. Arguments of defendants

In their arguments before this Court, defendants assert error by the trial court, under both the Rules of Evidence with regard to the admissibility of relevant evidence

in criminal trials and under the United States and North Carolina Constitutions in the context of a criminal defendant's right to present a defense under each instrument's Due Process Clause. Defendants' contentions largely mirror the positions which defendants took in the trial court as well as the Court of Appeals: that the State's evidence suggested that two people—a Black woman and a Hispanic man—committed the crimes which included the murder of Feimster; that Phillips, a Black woman, was identified early in the investigation of Feimster's murder as a potential suspect; that evidence from a confidential informant placed a car like Phillips's vehicle, with a Black woman inside of it, at the scene of the crimes near the time of their commission; that a gun of the same caliber that apparently was used in the murder of Feimster was found in Phillips's car, along with latex gloves; that the Hispanic male perpetrator wore dingy latex gloves while in Gregory's apartment; that the confidential informant reported that Tim Tim McCain was near Gregory's apartment and armed with a gun just before Feimster's murder; and that McCain was dressed in a manner similar to the male perpetrator. Defendants assert that this proffered evidence was relevant because it suggested that another male-female pair of wrongdoers had committed the crimes for which defendants were being tried. Defendant Abbitt specifically argues that any "evidence of third-party guilt would have thrown light upon the alleged offenses" and may have "constituted a possible alternative explanation and cast a reasonable doubt on the identity of the perpetrator." Defendants also contend that the trial court applied the wrong standard

in making its relevancy ruling, erroneously viewing the evidence in the light most favorable to the State rather than properly viewing it in the light most favorable to defendants.

Ultimately, defendants urge this Court to determine, not only that the trial court erred, but that the error also entitles them to new trials.

### B. Statutory and caselaw

In criminal cases, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see* U.S. Const. Amend. VI; N.C. Const. art. I, §§ 18, 23. Plainly, "the identity of the perpetrator of the crime charged is always a material fact." *State v. Jeter*, 326 N.C. 457, 458 (1990) (citing *State v. Johnson*, 317 N.C. 417, 425 (1986)).

> While the [federal] Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

*Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) (citations omitted). In North Carolina, the governing rules of evidence in this legal arena are Rules 401 and 402. We reiterate the significance of these evidentiary rules as we noted earlier in the Court of Appeals' analysis of this case, including the lower appellate court's recognition that relevant evidence is construed to be the type of evidence "having any

tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," N.C.G.S. § 8C-1, Rule 401, and hence it is generally admissible. *Id.*, Rule 402 (2021).

Questions of law concerning a trial court's alleged nonconformance with statutory provisions like the codified Rules of Evidence and concerning any alleged violation of a defendant's constitutional rights are reviewed de novo. *State v. Flow*, 384 N.C. 528, 546 (2023). Under de novo review, the reviewing court considers the matter anew and freely substitutes its own judgment for that of the lower court. *See, e.g.*, *Cmty. Success Initiative v. Moore*, 384 N.C. 194, 210 (2023). Appellate courts nonetheless accord great deference to a trial court's ruling on the relevancy of proffered evidence. *See, e.g.*, *State v. Lane*, 365 N.C. 7, 27, *cert. denied*, 565 U.S. 1081 (2011).

Where evidence "is proffered to show that someone other than the defendant committed the crime charged, admission of the evidence must do more than create mere conjecture of another's guilt in order to be relevant." *State v. McNeill*, 326 N.C. 712, 721 (1990). Rather, the proffered evidence "must (1) point directly to the guilt of some specific person, and (2) be inconsistent with the defendant's guilt." *Id.* (first citing *State v. Brewer*, 325 N.C. 550 (1989), *cert. denied*, 495 U.S. 951 (1990); and then citing *State v. Cotton*, 318 N.C. 663, 667 (1987)). This is so because

> [e]vidence casting doubt on the guilt of the accused
> and insinuating the guilt of another must be relevant in
> order to be considered by the jury. Because the relevancy
> standard in criminal cases is relatively lax, any evidence

-19-

> calculated to throw light upon the crime charged should be admitted by the trial court. However, the general rule remains that the trial court has great discretion on the admission of evidence. Evidence that another committed the crime for which the defendant is charged generally is relevant and admissible as long as it does more than create an inference or conjecture in this regard. Rather, it must point directly to the guilt of the other party. *The evidence must simultaneously implicate another and exculpate the defendant.*

*Miles*, 222 N.C. App. at 607 (extraneity omitted) (emphasis added). Thus, "[e]vidence which tends to show nothing more than *that someone other than the accused had an opportunity to commit the offense, without tending to show that such person actually did commit the offense and that therefore the defendant did not do so*, is too remote to be relevant and should be excluded." *Brewer*, 325 N.C. at 564 (emphasis added) (quoting *State v. Britt*, 42 N.C. App. 637, 641 . . . (1979)).

## C. Application of law to the facts of this case

Defendants' proffered evidence regarding Phillips and McCain as alternative suspects in Feimster's murder and related crimes was not "mere conjecture" and, as both the trial court and the State agreed with the defense at trial, appeared to "point directly to the guilt of some specific person." *McNeill*, 326 N.C. at 721. Due to this lack of dispute concerning defendants' satisfaction of the first prong of the relevancy test for the admissibility of their proffered evidence, we focus on the test's second prong in assessing the propriety of the trial court's ruling regarding whether the evidence at issue was "inconsistent with the defendant's guilt." *Id.*

The trial court noted that "the jury has received evidence that there were—there's communication going on on the night while this is all going down with other people that clearly tends to—to indicate there—there are other people involved with these two that are—are in the apartment. It doesn't exclude the defendant's [sic] guilt . . . ." In reviewing the statement of the confidential informant, the trial court observed that the report of the confidential informant indicated that the informant saw McCain near Gregory's apartment with a gun just before the time of the crimes; that McCain had not committed the murder himself; that a light-skinned Black female with short hair was seen in a Honda near the apartment; that the confidential informant never saw McCain with a Black woman at the apartment complex on the date of the crimes; that the confidential informant did not know anything about Ashley Phillips; that Feimster "was beefing" with her own sister; and that Feimster's sister wished Feimster were dead.

At the time when defendants' proffer of evidence was made, the evidence which had been presented to the jury for consideration tended to show that while only two people—a Black woman who possessed a small firearm[7] and a tall Hispanic man with wavy hair—were inside the apartment with the three family members during the commission of the crimes, one or more other persons were apparently involved in the criminal pair's attempt to obtain either some item which was not discovered in the

---

[7] The gun used to kill Feimster was described as "very small . . . . small enough to fit in the palm of the female[ ] suspect[']s hand."

apartment by the female perpetrator or some money from Feimster, based upon the telephonic and in-person exchanges overheard by Gregory while the unknown man and unknown woman were in the apartment. In addition, Gregory had identified both defendants with complete certainty through the usage of photographic lineups as the two people who entered her apartment on the night that Feimster was killed. Evidence introduced later in the trial tended to indicate that defendants, who denied knowing one another, had numerous cellular telephone contacts with each other in the days immediately surrounding the murder of Feimster. Although there was no evidence adduced at trial that defendants had cellular telephone communication with one another on the date of Feimster's murder, nonetheless the State's evidence tended to show that defendants were together in Gregory's apartment—the scene of the crimes, including Feimster's murder—on the critical date. Cellular telephone data further showed that defendants' cellular telephones were in the same cellular tower areas which provided service for Feimster's cellular telephone as the victim traveled from place to place, including Gregory's home, where Feimster was fatally shot.

Meanwhile, the defense's proffered evidence which was excluded at defendants' trial was that: (1) McCain, a man whose race and ethnicity were not identified in the record, was seen outside of Gregory's apartment with a large gun by a confidential informant just before the crimes at issue were committed, but McCain did not kill Feimster because McCain knew that he had been seen by the confidential informant; (2) an unknown Black woman was seen sitting in a tan Honda Accord at the

apartment complex before the crimes were committed; and (3) after the appearance of social media posts which cast suspicion on Phillips as the perpetrator of these criminal offenses, Phillips voluntarily went to the SPD in a car similar to the tan Honda Accord identified by the confidential informant as being situated at the apartment complex before the crimes were committed and from which SPD officers obtained a white latex glove, a Lorcin pistol, and spent .25 caliber shells.

As determined by the trial court and subsequently by the majority of the Court of Appeals panel, while defendants' proffered evidence implicates other suspects which were suggested by defendants, such evidence does not exculpate defendants. Taking the proffered evidence in the light most favorable to defendants, even if Phillips was seated in a car outside of Gregory's apartment during the commission of the crimes at issue in this case, and even if McCain was outside of Gregory's apartment just before the murder of Feimster, none of this excluded evidence, although pertinent, was sufficient to both implicate Phillips and McCain as the criminal perpetrators here *and* exculpate defendants Abbitt and Albarran as required by our relevancy standard.

## III.   Conclusion

While the evidence proffered by defendants in their response to the State's motion in limine to exclude the mention of possible guilt of other individuals was relevant to the issues presented at trial for the jury's resolution, nonetheless this potential evidence for the jury's consideration was not admissible. Although the

proffered evidence tended to point directly to the guilt of the specific persons Ashley Phillips and Tim Tim McCain—hence, making the evidence relevant—such evidence still did not tend to show that Phillips and McCain committed the offenses *and* that defendants Sindy Lina Abbitt and Daniel Real Albarran therefore did not commit the offenses—thus rendering the evidence inadmissible. In order to be both relevant *and* admissible, the evidence at issue here must have simultaneously implicated Phillips and McCain as it exculpated defendants Abbitt and Albarran. This dual requirement does not exist in the present case. The majority of the Court of Appeals panel which decided this case correctly applied the pertinent legal principles in discerning that defendants' proffered evidence may have insinuated that Phillips and McCain assisted in, or may have been involved in, the perpetration of these crimes, but such evidence was not inconsistent with direct and eyewitness evidence of either defendant's guilt. Consequently, as determined by the Court of Appeals, the trial court's exclusion of defendants' proffered evidence did not constitute prejudicial or reversible error. Therefore, as to the issue on direct appeal based on the dissenting opinion, we affirm the decision of the Court of Appeals.

AFFIRMED.

Justice EARLS dissenting.

Ms. Abbitt and Mr. Albarran should have been permitted to introduce evidence that someone else committed the murder, attempted robbery, and assault that they were accused of committing. "[C]riminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Accordingly, the United States Supreme Court has held that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). This right is rooted in the Due Process Clause of the Fourteenth Amendment, and in the Compulsory Process and Confrontation Clauses of the Sixth Amendment. *Crane*, 476 U.S. at 690 (citing *Trombetta*, 467 U.S. at 485). "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). But "[t]his right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused.' " *Holmes*, 547 U.S. at 324 (second alteration in original) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1988)). Thus, when the trial court in this case excluded evidence tending to show that two people other than defendants committed the charged offenses, Abbitt and Albarran were denied their constitutional right to a fair trial, *Chambers*, 410 U.S. at 294, and "a meaningful opportunity to present a complete defense," *Holmes*, 547 U.S.

at 324 (quoting *Crane*, 476 U.S. at 690).

While "[s]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," that authority is still subject to constitutional limits. *Id.* (quoting *Scheffer*, 523 U.S. at 308). Namely, state rules of evidence may not be " 'arbitrary' or 'disproportionate to the purposes they are designed to serve.' " *Id.* (quoting *Scheffer*, 523 U.S. at 308). In North Carolina "[t]he admissibility of evidence of the guilt of one other than the defendant" is governed by the Rules of Evidence, specifically the rule of relevancy. *State v. Israel*, 353 N.C. 211, 217 (2000) (quoting *State v. Cotton*, 318 N.C. 663, 667 (1987)). Under North Carolina Rule of Evidence 401, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2021). This standard is "relatively lax" and "[r]elevant evidence, as a general matter, is considered to be admissible." *State v. McElrath*, 322 N.C. 1, 13 (1988); *Israel*, 353 N.C. at 219 (stating that the standard of relevance "in criminal cases is particularly easily satisfied" and " '[a]ny evidence calculated to throw light upon the crime charged' should be admitted by the trial court.") (quoting *McElrath*, 322 N.C. at 13)).

To admit evidence implicating someone other than the defendant, this Court has stated that, the evidence "must do more than cast doubt over the defendant's guilt." *Israel*, 353 N.C. at 217. Put another way, the evidence must do "more than

create an inference or conjecture" of the other person's guilt and instead "must tend *both* to implicate another *and* be inconsistent with the guilt of the defendant." *Id.* (quoting *Cotton*, 318 N.C. at 667). But this standard must be interpreted consistently with Rule 401 of the North Carolina Rules of Evidence. *See McElrath*, 322 N.C. at 13; *see also Israel*, 353 N.C. at 219. Thus, while the standard to introduce evidence of third-party guilt is more specific than what is stated in Rule 401, it remains a test of relevancy and cannot be used as a high bar to exclude almost all evidence that someone other than the defendant committed the crime. *See Cotton,* 318 N.C. at 667 ("The admissibility of evidence of the guilt of one other than the defendant is governed . . . by the general principle of relevancy.") Properly interpreted, the requirement that the proffered evidence "must tend *both* to implicate another *and* be inconsistent with the guilt of the defendant," *Israel*, 353 N.C. at 217 (quoting *Cotton*, 318 N.C. at 667), simply means that the proffered evidence must tend to show the defendant did not commit the crime because someone other than the defendant was the perpetrator.

In this case, the trial court misapplied our relevancy standard at the outset of its analysis. While evidence offered by the defendant is to be "viewed in the light most favorable to the defendant," *State v. Larrimore*, 340 N.C. 119, 144–45 (1995), the trial court viewed the evidence in the light most favorable to the State. In doing so, the trial court misinterpreted the relevancy standard as setting a higher bar than what is required. That is, the trial court refused to draw reasonable inferences in favor of Abbitt and Albarran, and instead drew those inferences in favor of the State by

making the unsupported assumption that Abbitt and Albarran may have acted together with Ashley Phillips and "Tim Tim" McCain to commit the charged crimes.[1] Likewise, the majority's analysis proceeds to make the same mistake the trial court did. Specifically, the majority's analysis effectively draws reasonable inferences in favor of the State and not the defendants.

Abbitt and Albarran were charged with first-degree murder, attempted robbery with a dangerous weapon, and assault with a deadly weapon. After trial began, the State filed a Motion in Limine to Preclude Mention of Possible Guilt of Another. After hearing arguments on the motion, the trial court determined that the proffered evidence was not inconsistent with the defendant's guilt and prevented the defendants from presenting it. Specifically, defendants wanted to introduce evidence tending to show that Phillips and McCain committed the crimes. The trial court appears to have concluded that the evidence met the first part of the standard, specifically that it went beyond "conjecture," but failed to meet the second part of the

---

[1] While our precedent in *Larrimore*, 340 N.C. at 144–45, does not explicitly state that reviewing the proffered evidence in the light most favorable to defendants requires that reasonable inferences be drawn in their favor, it stands to reason that drawing reasonable inferences in the defendants' favor is part of this analysis. *See Keith v. Health-Pro Home Care Servs., Inc.*, 381 N.C. 442, 455 (2022) ("[I]n determining the sufficiency of the evidence to withstand a motion for a directed verdict, all of the evidence which supports the non-movant's claim must be taken as true and considered in the light most favorable to the non-movant, giving the non-movant the benefit of every reasonable inference which may legitimately be drawn therefrom and resolving contradictions, conflicts, and inconsistencies in the non-movant's favor.") (quoting *Turner v. Duke Univ.*, 325 N.C. 152, 158 (1989)); *New Hanover Cnty. Bd. of Educ. v. Stein*, 380 N.C. 94, 106–07 (2022) (In evaluating the party's complaint, this Court must "take the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." ).

test, namely that even if true, it did not rule out defendants as perpetrators of the crime. In these circumstances, accepting this analysis would effectively bar any and all evidence that another individual committed the crime because the court could, in every case, assume there were multiple perpetrators.

This evidence implicating Phillips and McCain included that the glove box of Phillips's car held a .25 caliber gun, which was consistent with the gun that killed the victim, and white latex gloves, which were consistent with gloves worn by the male perpetrator. While DNA swabs were taken from the .25 caliber gun and the latex gloves, these items were never submitted for testing and no testing was completed on them. A confidential informant also placed a car consistent with the make and model of Phillips's car near the scene of the crime at the time the murder occurred, and Phillips arrived at the police station for questioning in that same vehicle. Phillips was also the first person investigated in connection with this case and the first person identified by the family of the deceased. Indeed, when the victim's mother, Ms. Gregory, saw a photograph of Phillips, she stated "Well, she does look like her," referring to the woman who came into her apartment and shot her daughter. Despite this, the police did not include a picture of Phillips in the photographic lineup it conducted with Gregory.

A confidential informant also placed McCain at the apartment complex where the murder occurred "minutes before the murder." At the time, McCain "was carrying a pistol and trying to conceal his face." The informant also noted that when he saw

McCain, McCain was with a Black woman, who the confidential informant implied shot the victim at McCain's request.

During the hearing on the State's motion in limine, the trial court applied the incorrect standard. Rather than take the above evidence in the light most favorable to defendants, the court announced "that [it was] taking the evidence in the light most favorable to the State." In doing so, the trial court found that the proffered evidence did not meet the standard articulated in *State v. Cotton*, 318 N.C. at 667, because it was not inconsistent with Ms. Abbitt's and Mr. Albarran's guilt. But by viewing the proffered evidence in the light most favorable to the State, the trial court started off on the wrong foot, and this error affected the entirety of the court's analysis.

Additionally, *State v. Israel,* is analogous to this case and undermines the majority's holding. In *Israel*, a first-degree murder prosecution, the jury was not permitted to hear certain evidence tending to show that a different person had the opportunity and motive to murder an elderly woman in her apartment. 353 N.C. 211 (2000). There was evidence that the victim was afraid of her former boyfriend and that the man had been seen at the victim's apartment building the week of the murder. *Id.* at 215. This Court explained that the former boyfriend's violent "history with the victim [gave him] a possible motive" and that, because he had been seen "on the surveillance videotape entering and leaving the victim's apartment" within a day of the victim's death, the former boyfriend had the opportunity to kill her. *Id.* at 219.

Similarly, in this case there was evidence that the woman the informant saw at the apartment complex on the night of the murder had been "beefing" with the victim, which points to motive. The fact that on the night of the murder, a confidential informant saw a woman who may have been Phillips and a man the informant affirmatively identified as McCain at the apartment complex where the murder took place also points to opportunity. Furthermore, the evidence of opportunity in the present case is stronger than that in *Israel*. In *Israel* the victim's estimated time of death was between 10 and 12 December, and the video surveillance showed the former boyfriend at the victim's apartment building on 9 and 11 December. *Id.* at 214. Yet the Court determined that the trial court's exclusion of this evidence was erroneous there because the evidence "tended both to exonerate defendant and implicate another perpetrator." *Id.* at 216.

Additionally, in *Israel* the Court noted that exclusion of this evidence was prejudicial because it could not be "said the error did not affect the outcome of the defendant's trial." *Id.* Here a woman resembling Phillips and a car consistent with the make and model of Phillips's car, along with McCain, were seen in close proximity to the scene of the murder at the time of the murder, and the woman at the scene was said to have been "beefing" with the victim. As seen in *Israel*, this evidence of motive and opportunity is relevant as it tends to implicate Phillips and McCain, and when viewed in the light most favorable to defendants, is inconsistent with their guilt because it tends to show that someone else committed the crime. Furthermore, this

case has two characteristics that *Israel* lacked: (1) evidence of items pointing to the modus operandi of the crimes and (2) a positive identification of Phillips by the victim's mother. The evidence pointing to the modus operandi here included a .25 caliber gun and white latex gloves found in Phillips's car, and her car was consistent with the make and model of the vehicle the confidential informant saw near the scene of the crimes. This additional evidence, along with Gregory's initial identification of Phillips, lends credence to the defense's theory of the case and tends to show that someone other than Abbitt and Albarran committed the crimes.

The trial court incorrectly determined that the evidence "may go to the guilt of another person, [but] doesn't exclude the defendants . . . from guilt." In reaching its decision, the trial court reasoned that even though the proffered evidence pointed to another suspect, the jury had received evidence that the perpetrators had been communicating with someone else on the night of the murder. According to the trial court, this scenario indicated that "there may have been other people involved" in the crimes. Specifically, the proffered evidence was not inconsistent with the defendants' guilt because all four suspects: Abbitt, Albarran, Phillips, and McCain may have committed the crime together. Thus, according to the court, the evidence "doesn't exclude the defendants' . . . from guilt." Yet, as Judge Murphy noted in his dissent at the Court of Appeals, the record lacks evidence linking Abbitt, Albarran, Phillips, and McCain, "by phone or otherwise." *State v. Abbitt*, 278 N.C. App. 692 (2021) (Murphy, J., dissenting in part and concurring in part). According to Gregory's testimony, only

two perpetrators were in her home when her daughter was murdered. While she testified that two or three phone calls transpired between the male perpetrator and someone else, she did not testify about who the someone else was. There is no evidence that McCain, Phillips, Abbitt, and Albarran committed this offense together. Thus, the trial court assumed there was a connection between the four, without any evidentiary support, and based on that assumption, excluded potentially exculpatory evidence that someone else may have committed the crimes.

The majority's analysis suggests that because the facts of this case imply the involvement of more than two actors, it is not possible for the proffered evidence to be inconsistent with Ms. Abbitt's and Mr. Albarran's guilt. This is simply not true. As noted above, there is no evidence in the record linking Phillips, McCain, Abbitt, and Albarran together. Drawing all reasonable inferences in defendants' favor, as must be done for these purposes, the evidence implicating Phillips and McCain was inconsistent with Ms. Abbitt's and Mr. Albarran's guilt and should have been introduced at trial.

Defendants also should have had the opportunity to impeach Gregory's testimony. "The primary purpose of impeachment is to reduce or discount the credibility of a witness for the purpose of inducing the jury to give less weight to his testimony in arriving at the ultimate facts in the case." *State v. Bell*, 249 N.C. 379, 381 (1959) (quoting *State v. Nelson*, 200 N.C. 69, 72 (1930)). Namely, because Gregory had initially identified Phillips as resembling the woman who was in her apartment

on the night of the murder, this evidence could have called Gregory's recollection of the individuals in the apartment into question. Taken together, the proffered evidence "constitute[d] a possible alternative explanation for the victim's unfortunate demise and thereby cast[ ] crucial doubt upon the State's theory of the case," *State v. McElrath*, 322 N.C. at 13–14, however, the jury never heard this potentially exculpatory evidence.

Excluding this evidence was erroneous and prejudicial to both defendants. "A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt." N.C.G.S. § 15A-1443(b) (2021). It is the State's burden "to demonstrate, beyond a reasonable doubt, that the error was harmless." *Id*. In this case the State cannot meet that burden because it cannot show that "the trial court's erroneous exclusion of evidence that tended both to exonerate defendant and implicate another perpetrator . . . [did not] infect[ ] the evidence supporting the conviction," and "it cannot be said the error did not affect the outcome of defendant's trial." *Israel*, 353 N.C. at 216 (citing N.C.G.S. § 15A-1443(a) (1999)).  In these circumstances, the State cannot show that, after hearing evidence of third-party guilt, the jury would still have convicted Abbitt and Albarran.

Wrongful convictions can occur when relevant and potentially exculpatory evidence is kept from the jury.  Although this is but one case, the trial court's decision to exclude this evidence and this Court's affirmance of that decision have broader

implications. Between 1989 and 24 August 2023, 3,361 people were exonerated in the United States following wrongful convictions. UCI Newkirk Ctr. for Sci. & Soc'y et al., *The National Registry of Exonerations: Exonerations by State*, https://www.law.umich.edu/special/exoneration/Pages/Exonerations-in-the-United-States-Map.aspx (last visited Aug. 24, 2023). These wrongful convictions range from robbery to murder and in total amount to 29, 950 years lost to wrongful incarceration. *Id*. During this same period, North Carolina exonerated 73 people, 37% of whom experienced a wrongful conviction for murder. *Id*. In total, wrongfully convicted North Carolinians have wasted 935.6 years of their lives behind bars. *Id*.

Our Rules of Evidence serve to protect against wrongful convictions, however, if they are misapplied, these rules can hinder the accuracy of our criminal justice system rather than bolster it.[2] In this case the misapplication of our relevancy standard led to the conviction of two people who may not have been found guilty if the jury had heard the evidence tending to show that Phillips and McCain committed the crimes. On average, each wrongfully convicted North Carolinian has lost 12.82 years of his or her life to incarceration, and in some cases, people have spent 20 years

---

[2] Another example is Rule 404 of the North Carolina Rules of Evidence, which states that "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." N.C. R. Evid. 404(a). While there are exceptions to this rule, it generally serves to protect the accused from a conviction that is based solely on what the jury thinks of the accused person's character and instead focuses the jury's attention on whether jurors believe the defendant committed the crime for which he or she is on trial for.

or more in prison for crimes they did not commit.[3] *Id.* Wrongful convictions do not serve the interests of justice or of the State or victims of criminal acts.

The United States Constitution grants defendants the right to present a meaningful defense, *Holmes*, 547 U.S. at 324, and the right to a fair trial, *Chambers*, 410 U.S. at 294. Our rule of relevancy related to the admission of evidence of third-party guilt must be in line with these overarching constitutional principles. *See* N.C. G.S., Rule 8C-1, 401 (official cmt. (2021)); *see also McElrath*, 322 N.C. at 13; *Israel*, 353 N.C. at 219 (quoting *McElrath*, 322 N.C. at 13). Under the correct application of the Rules of Evidence and the relevancy standard, Abbitt and Albarran are entitled to a new trial in which they are permitted to introduce evidence of third-party guilt. Because the trial court misapplied the legal standard and improperly excluded the evidence of third-party guilt that Abbitt and Albarran sought to admit, I dissent.

---

[3] For example, Larry Lamb was convicted of murder and sentenced to life in prison in 1993. UCI Newkirk Ctr. for Sci. & Soc'y et al., *Larry Lamb: Other North Carolina Exonerations*, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4240 (last visited on Aug. 24, 2023). He was incarcerated until 2013, when he was exonerated following a new trial, which showed that testimony at Mr. Lamb's original trial had been false. *Id.* Similarly, Willie Womble spent 38.3 years in prison after being convicted of murder in 1976 and was exonerated only after the man who actually committed the crime wrote a letter to the North Carolina Innocence Inquiry Commission which reviewed the case and successfully recommended that a judicial panel vacate Womble's conviction. *Id.* (last visited Aug. 24, 2023).