IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-865

Filed 6 August 2024

Columbus County, Nos. 20 CRS 50435, 404

STATE OF NORTH CAROLINA

　　　　　v.

DAQUON ROLLO CORROTHERS

Appeal by defendant from judgments entered 10 October 2022 by Judge Tiffany Peguise-Powers in Columbus County Superior Court. Heard in the Court of Appeals 5 March 2024.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Marc X. Sneed, for the State.*
>
> *Drew Nelson for defendant-appellant.*

ZACHARY, Judge.

Defendant appeals from the judgments entered upon a jury's verdicts finding him guilty of first-degree murder and robbery with a dangerous weapon. On appeal, Defendant argues that the trial court committed plain error in admitting certain evidence at trial, and that he received ineffective assistance of counsel as a result of his trial counsel's failure to file a motion to suppress that evidence. Defendant also contends that the trial court erroneously denied his motions to dismiss and motion to set aside the jury's verdict. After careful review, we dismiss Defendant's appeal in part, and conclude that he received a fair trial, free from error.

## BACKGROUND

At a social gathering on the evening of 27 January 2020 at Derby's, a hangout in Columbus County, the victim Alex Moore asked Regina Spaulding, a family friend of Moore's, to lend him $400.00 in cash to help him "get his four-wheeler fixed and whatnot[.]" Spaulding understood this "to mean a drug deal, to be honest[,]" and lent Moore the money. Moore told her that he was going to Defendant's home, less than five minutes away, and then would return. Moore also texted Spaulding a screenshot of Defendant's phone number.

Spaulding became concerned when Moore failed to return after a couple of hours. She called Moore, who told her that he "was coming home." But Moore "never showed back up[,]" so Spaulding continued to call him. However, her calls went straight to voicemail, then automated text messages were sent to her cellular phone from Moore's cellular phone saying, "I'll call you back."

After several hours, Spaulding called Marcus Solomon, another friend, told him what happened, and asked him to call Moore. When Moore did not answer Solomon's calls, Spaulding went to Moore's residence; however, neither Moore nor his truck were there. Spaulding told Moore's father that they were looking for Moore.

Early the next morning, on 28 January 2020, Spaulding discovered Moore's empty truck parked at a cemetery. Moore's father reported him to authorities as missing that day.

On 4 February 2020, Columbus County Sheriff's Detective Paul D. Rockenbach

"initiated the assistance of Special Agent J. Bain with the North Carolina State Bureau of Investigation[,] who was able to pin-point a more accurate last known location of the cellular phone belonging to [Moore]." Agent Bain identified Defendant's Clarkton residence ("the Property") as the last location of Moore's cellular phone and determined that Moore's cellular phone "was at this location for approximately thirty minutes prior to going offline" on the evening of 27 January 2020.

Detective Rockenbach traveled to the Property that same day, 4 February 2020. He knocked on the door, but no one answered. Detective Rockenbach observed that there were four vehicles parked outside the house and a wheelchair on the front porch. Solomon had opined to Detective Rockenbach that Defendant should not have been "physically able to hurt" Moore. From this, Detective Rockenbach concluded that the wheelchair may have belonged to "the individual . . . Moore was going to see to complete [the] drug transaction[,]" i.e., Defendant. While at the Property, Detective Rockenbach walked about the front and rear of the house, "look[ing] around the curtilage[.]" Around the rear of the house, Detective Rockenbach noticed a hole in the ground.

On 5 February 2020, Detective Rockenbach secured a search warrant for the Property. Officers executed the search warrant that day and located Moore's body inside a "hole approximately six feet in length, maybe three to four feet in width, and . . . filled with water[.]" The hole "[a]ppeared to be manmade [and] dug by hand[.]"

Officers extracted Moore's body after pumping the water out of the hole. They also located "two burn piles in the back part of the residence."

An autopsy revealed that Moore suffered gunshot wounds to several areas of the body, including his head, abdomen, ribs, and forearm, as well as blunt-force injuries. The associate chief medical examiner testified that the cause of Moore's death was multiple gunshot wounds, most of which likely would have been fatal in isolation.

On 6 February 2020, Detective Rockenbach obtained a search warrant for Defendant's cellular phone records.

On 3 June 2020, a grand jury returned a true bill of indictment charging Defendant with murder. On 9 December 2020, a grand jury returned a second true bill of indictment charging Defendant with robbery with a dangerous weapon based on the allegation that Defendant stole "$400.00 from the person . . . of Alex Moore."

On 9 September 2022, FBI Special Agent Harrison Putnam obtained the cellular phone records in this case, including for Defendant's AT&T cellular phone and Moore's Verizon cellular phone. The records showed that Moore's Verizon cellular phone entered the coverage area of the Property and vehicle-recovery location at approximately 6:11 p.m. on the evening of 27 January 2020. From approximately 6:12 to 6:34 p.m., Moore's cellular phone remained "right in the area of [the Property]," and was "definitely there or near that location" during this period.

Records from Defendant's AT&T cellular phone likewise revealed that "sometime between 6:23 and 6:38 [p.m.], [Defendant's] AT&T phone traveled . . . to the coverage area of the Emerson tower[,]" which Special Agent Putnam described as "the cell site [he] would most expect to provide coverage to the vehicle recovery location and the [Property]." Special Agent Putnam testified that Defendant's AT&T cellular phone remained in the coverage area of the Emerson tower until approximately 6:47 p.m. on the evening of 27 January 2020.

This matter came on for a jury trial on 29 September 2022. On 10 October 2022, the jury returned verdicts finding Defendant guilty of first-degree murder and robbery with a dangerous weapon. The trial court sentenced Defendant to life imprisonment without parole for the first-degree murder conviction, and a concurrent, active term of 64 to 89 months for the robbery with a dangerous weapon conviction.

Defendant gave oral and written notice of appeal.

## DISCUSSION

Defendant argues that "the trial court committed plain error by failing to suppress the evidence collected pursuant to the search warrant issued for . . . [the Property], the search warrant related to [Defendant's] phone, and the follow-on warrants[,]" in that the search warrants were tainted by Detective Rockenbach's alleged unlawful 4 February search of the curtilage of Defendant's residence. However, Defendant neglected to file a motion to suppress this evidence. Accordingly,

on 19 October 2023, Defendant filed in this Court a petition for writ of certiorari requesting that we invoke Rule 2 of our Rules of Appellate Procedure to allow review of his unpreserved constitutional arguments.

Defendant further argues that "[s]hould this Court decline to exercise its authority under Rule 2 or determine that the trial court did not commit plain error, this Court should hold that [Defendant] received ineffective assistance of counsel" due to trial counsel's failure to file a motion to suppress the evidence seized pursuant to the search warrants.

Lastly, Defendant contends that the trial court erred by denying his motions to dismiss the first-degree murder charge and his motion to set aside the jury's verdict finding him guilty of first-degree murder.

I.    Plain Error Review

Defendant first argues that "the trial court committed plain error by failing to suppress the evidence collected pursuant to the search warrant issued" for the Property, as well as "the search warrant related to [Defendant's] phone, and the follow-on warrants."

During Defendant's trial, Detective Rockenbach testified that, on 4 February 2020, he traveled to the Property and attempted to conduct a "knock and talk." He explained: "I knocked on the door. There were several cars there, and nobody came to the door, so I went back out, and . . . I noticed a hole." As Detective Rockenbach recalled, "we got to go out [to the Property] on the 4th, check it out, and nobody comes

to the place. I see an area of interest as I'm walking around the curtilage, and I go and apply for a search warrant."

In light of this admission by Detective Rockenbach that he observed a hole on the Property prior to applying for the search warrants, Defendant contends that all subsequent evidence required suppression by the trial court, and that the trial court committed plain error in not suppressing the evidence.

In *State v. Miller*, our Supreme Court "h[e]ld that [the] defendant's Fourth Amendment claims [were] not reviewable on direct appeal, even for plain error, because he completely waived them by not moving to suppress [the] evidence . . . before or at trial." 371 N.C. 266, 267, 814 S.E.2d 81, 82 (2018). "Fact-intensive Fourth Amendment claims like these require an evidentiary record developed at a suppression hearing. Without a fully developed record, an appellate court simply lacks the information necessary to assess the merits of a defendant's plain error arguments." *Id.* at 270, 814 S.E.2d at 83–84.

As the *Miller* Court explained:

> When a defendant does not move to suppress . . . the State does not get the opportunity to develop a record pertaining to the defendant's Fourth Amendment claims. Developing a record is one of the main purposes of a suppression hearing. At a suppression hearing, both the defendant and the State can proffer testimony and any other admissible evidence that they deem relevant to the trial court's suppression determination.

*Id.* at 270, 814 S.E.2d at 84.

In light of the holding in *Miller*, we cannot review for plain error the merits of Defendant's arguments concerning the trial court's failure to suppress evidence. *See id.* at 273, 814 S.E.2d at 85–86 (remanding to this Court "for consideration of [the] defendant's ineffective assistance of counsel claim" where "the Court of Appeals should not have conducted plain error review in the first place").

Accordingly, we deny Defendant's petition for writ of certiorari and his request that we invoke Rule 2 of our Rules of Appellate Procedure to review for plain error Defendant's unpreserved constitutional challenge, and we dismiss this portion of his appeal.

II.     Ineffective Assistance of Counsel

Next, Defendant argues that his trial counsel "provided ineffective assistance by failing to file a motion to suppress the evidence" obtained pursuant to the search warrants issued after Detective Rockenbach's observation of the hole behind the Property.

"In order to show ineffective assistance of counsel, a defendant must satisfy the two-prong test announced by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668, [. . .] 80 L. Ed. 2d 674 (1984)[,]" which was adopted by our Supreme Court in *State v. Braswell*, 312 N.C. 553, 324 S.E.2d 241 (1985). *State v. Harris*, 255 N.C. App. 653, 657, 805 S.E.2d 729, 733 (2017). "First, the defendant must show that counsel's performance was deficient." *Id.* (citation omitted). "Second, the defendant must show that the deficient performance

prejudiced the defense." *Id.* (citation omitted). "Unless a defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 658, 805 S.E.2d at 733 (cleaned up).

"[A]n ineffective assistance of counsel claim brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required." *Id.* (cleaned up); *e.g.*, *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001) (providing, for example, that the cold appellate record may be sufficient to decide a claim of ineffective assistance of counsel that "may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing"), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002).

To demonstrate that counsel's performance was deficient, a defendant must show that his attorney committed such serious errors during trial that the attorney "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Harris*, 255 N.C. App. at 657, 805 S.E.2d at 733 (citation omitted), in other words, that "counsel's conduct fell below an objective standard of reasonableness[,]" *Braswell*, 312 N.C. at 561–62, 324 S.E.2d at 248. Trial counsel's decision not to file a motion to suppress evidence does not fall below "an objective standard of reasonableness[,]" *State v. Canty*, 224 N.C. App. 514, 517, 736 S.E.2d 532, 535 (2012) (citation omitted), *disc. review denied*, 366 N.C. 578, 739 S.E.2d 850 (2013), and therefore, does not evince that the attorney's performance was deficient "where

the search . . . that led to the discovery of the evidence was lawful[,]" *id*.

In this case, Defendant asserts that "the central question raised in [his] brief" is "whether the warrant application was 'prompted by' the illegal search" of the curtilage when Detective Rockenbach first visited the Property. By contrast, the State contends that "[g]iven that Moore's last known location was Defendant's residence and he had been missing for approximately one week, there was probable cause to search Defendant's residence."

We conclude that the cold record establishes that Detective Rockenbach's observation of the hole during his walk about the Property after his unsuccessful "knock and talk" on 4 February 2020 did not prompt the warrant applications when viewed in light of the totality of the circumstances, which supported the trial court's determinations of probable cause. Accordingly, we agree with the State on this issue.

"The Fourth Amendment to the United States Constitution protects the people from unreasonable searches and seizures." *State v. Allman*, 369 N.C. 292, 293, 794 S.E.2d 301, 302 (2016) (citation omitted). Article I, Section 20 of the North Carolina Constitution "likewise prohibits unreasonable searches and seizures and requires that warrants be issued only on probable cause." *Id*. at 293, 794 S.E.2d at 302–03.

"At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31, 150 L. Ed. 2d 94, 100 (2001) (cleaned up). This heightened expectation of privacy extends not only to the home itself, but also to the

home's curtilage. *See State v. Grice*, 367 N.C. 753, 759–60, 767 S.E.2d 312, 317–18, *cert. denied*, 576 U.S. 1025, 192 L. Ed. 2d 882 (2015). As our Supreme Court has explained, "the curtilage of the home will ordinarily be construed to include at least the yard around the dwelling house as well as the area occupied by barns, cribs, and other outbuildings." *Id.* at 759, 767 S.E.2d at 317 (citation omitted).

A "knock and talk" investigation does not implicate the Fourth Amendment: "no search of the curtilage occurs when an officer is in a place where the public is allowed to be, such as the front door of a house." *State v. Lupek*, 214 N.C. App. 146, 151, 712 S.E.2d 915, 919 (2011). Nonetheless, the "curtilage . . . protects the privacies of life inside the home[,]" *Grice*, 367 N.C. at 760, 767 S.E.2d at 318 (cleaned up), and the Fourth Amendment therefore protects the curtilage of one's home, absent the existence of circumstances permitting an exception to the warrant requirement. *See, e.g., id.* ("On one end of the [Fourth Amendment] spectrum, we have the home, which is protected by the highest constitutional threshold and thus may only be breached in specific, narrow circumstances. On the other end, we have open fields, which even though they may be private property may be reasonably traversed by law enforcement under the Fourth Amendment."); *State v. Marrero*, 248 N.C. App. 787, 794, 789 S.E.2d 560, 566 (2016) (explaining that "[a]n exigent circumstance is found to exist in the presence of an emergency or dangerous situation" (cleaned up)).

"[A] warrant may be issued only on a showing of probable cause." *Allman*, 369 N.C. at 293, 794 S.E.2d at 302 (cleaned up). "[A]n application for a search warrant

must be supported by one or more affidavits particularly setting forth the facts and circumstances establishing probable cause to believe that the items . . . are in the place to be searched." *Id.* at 294, 794 S.E.2d at 303 (cleaned up).

Probable cause exists when the supporting affidavit "gives the magistrate reasonable cause to believe that the search will reveal the presence of the items sought on the premises described in the warrant application, and that those items will aid in the apprehension or conviction of the offender." *Id.* (cleaned up). The magistrate is permitted to "draw reasonable inferences from the available observations" in the affidavits. *Id.* (cleaned up). As long as the totality of the circumstances "yield[s] a fair probability that a police officer executing the warrant will find contraband or evidence of a crime at the place to be searched, a magistrate has probable cause to issue [the] warrant." *Id.*

Moreover, a search warrant is valid despite a prior unlawful entry "where the information used to obtain the search warrant was not derived from an initial unlawful entry, but rather came from sources wholly unconnected with the unlawful entry and was known to the agents well before the initial unlawful entry." *State v. Robinson*, 148 N.C. App. 422, 430, 560 S.E.2d 154, 160 (2002). Accordingly, "the dispositive question is whether the search warrant . . . was based on, or prompted by, information obtained from the officers' warrantless entry," or whether it was "based on information acquired independently of the warrantless entry so as to purge the search warrant of the primary taint." *Id.*

Here, we need not consider whether Detective Rockenbach unlawfully entered the rear curtilage of the home. It is plain that the affidavit attached to the initial search warrant application provides abundant support for the issuance of a search warrant, even absent an allegation regarding Detective Rockenbach's observation of the hole. The initial warrant application established that Moore had been missing for approximately one week; that he was last known to be headed to the Property to conduct a drug deal; that Moore's cellular phone was pinpointed at the Property, where it went offline after 30 minutes; and that individuals at the Property were not answering the door. For the subsequent search warrants, Detective Rockenbach additionally averred that "Moore's remains were found on the property in which [Defendant] lives." Detective Rockenbach's affidavit supporting the application to search the Property makes no reference to the hole, and the facts alleged in the application reveal that the allegations "came from sources wholly unconnected with the [alleged] unlawful entry and w[ere] known to [Detective Rockenbach] before the initial [alleged] unlawful" walk about the curtilage of the Property. *Id.*

The search warrants were supported by probable cause—they were not "based on, or prompted by, information obtained from" Detective Rockenbach's alleged unlawful entry, but rather "on information acquired independently of the warrantless entry so as to purge the search warrant of [any] primary taint." *Id.*

"[F]ailure to file a motion to suppress is not ineffective assistance of counsel where the search . . . that led to the discovery of the evidence was lawful." *Canty*, 224

- 13 -

N.C. App. at 517, 736 S.E.2d at 535. Accordingly, Defendant has failed to demonstrate that he received ineffective assistance of counsel, and we dismiss this claim.

    III.    <u>Motions to Dismiss and Motion to Set Aside Verdict</u>

Lastly, Defendant contends that the "trial court erred by failing to grant the motions to dismiss made during the trial and the motion to set aside the verdict" for the charge of murder because, even "viewing the evidence in the light most favorable to the [S]tate, there was not substantial evidence that [he] murdered Alex Moore."

A.  Standard of Review

"We review the denial of a motion to dismiss based on an insufficiency of evidence de novo." *State v. Steele*, 281 N.C. App. 472, 476, 868 S.E.2d 876, 880, *disc. review denied*, 382 N.C. 719, 878 S.E.2d 809 (2022).

"In ruling on a motion to dismiss, the trial court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Osborne*, 372 N.C. 619, 626, 831 S.E.2d 328, 333 (2019) (citation omitted). "Substantial evidence" is simply that amount of evidence "necessary to persuade a rational juror to accept a conclusion." *Id.* (citation omitted). The evidence is "considered in the light most favorable to the State[,]" and "the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom." *Id.* (cleaned up). Evidence unfavorable to the State "is not to be taken into consideration." *State v. Israel*, 353 N.C. 211, 216, 539 S.E.2d 633, 637 (2000).

"[I]f the record developed before the trial court contains substantial evidence, whether direct or circumstantial, or a combination, to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." *Osborne*, 372 N.C. at 626, 831 S.E.2d at 333 (cleaned up).

"The standard of review of a trial court's denial of a motion to set aside a verdict for lack of substantial evidence is the same as reviewing its denial of a motion to dismiss, i.e., whether there is substantial evidence of each essential element of the crime." *State v. Duncan*, 136 N.C. App. 515, 520, 524 S.E.2d 808, 811 (2000).

B. Analysis

In the present case, the State charged Defendant with murder pursuant to N.C. Gen. Stat. § 14-17. Section 14-17 provides, in pertinent part, that "[a] murder which shall be perpetrated by means of a . . . willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any . . . robbery . . . shall be deemed to be murder in the first degree[.]" N.C. Gen. Stat. § 14-17(a) (2023). The jury found Defendant guilty of first-degree murder on the basis of both "malice, premeditation and deliberation" as well as "[u]nder the first[-]degree felony murder rule[.]"

"When viewed in the light most favorable to the State, sufficient evidence supported the inference that Defendant" committed the first-degree murder of Moore. *State v. Rogers*, 255 N.C. App. 413, 416, 805 S.E.2d 172, 174 (2017). Spaulding

testified that Moore left on the evening that he went missing to conduct "a drug deal" with Defendant at Defendant's home. Before he left, Moore sent Spaulding a screenshot of Defendant's contact information.

The State introduced into evidence a long exchange of text messages between Defendant and Moore, including texts from the day that Moore went missing. In these texts, the two men arranged the details of Moore's pending drug purchase from Defendant. Detective Rockenbach testified that the "last exchange to" Defendant was Moore saying that he was "outside" at 6:14 p.m., and that "[t]he rest of the messages are just from [Defendant] to [Moore]'s phone." Special Agent Putnam also analyzed Moore's Verizon cellular phone records, which showed that Moore's cellular phone entered the coverage area of the Property and vehicle-recovery location at approximately 6:11 p.m. on the evening of 27 January 2020. From approximately 6:12 to 6:34 p.m., Moore's cellular phone remained "right in the area of the [Property]" and was "definitely there or near that location" during this period.

Special Agent Putnam also provided evidence regarding Defendant's AT&T cellular phone data, which showed that "sometime between 6:23 and 6:38 [p.m.], [Defendant's] AT&T phone traveled . . . to the coverage area of the Emerson tower[,]" which Special Agent Putnam described as "the cell site [that he] would most expect to provide coverage to the vehicle recovery location and the [Property]." Special Agent Putnam also testified that Defendant's AT&T cellular phone remained within the

coverage area of the Emerson tower until approximately 6:47 p.m. on the evening of 27 January 2020.

Additionally, the State presented evidence that upon searching Defendant's home, officers discovered one shotgun shell casing under the couch and another on a space heater, as well as a long gun. In Defendant's bedroom, officers discovered additional 9-millimeter ammunition. Forensic firearms examiner Kelby Glass of the Cumberland County Sheriff's Office testified "that the projectiles that were removed from the body of" Moore were "consistent with the ammo that was found in [Defendant's] room[.]"

We conclude that, viewed in the light most favorable to the State, this constitutes substantial evidence from which a jury could reasonably infer Defendant's guilt of murder. *See Rogers*, 255 N.C. App. at 416, 805 S.E.2d at 174–75. Accordingly, the trial court did not err when it denied Defendant's motions to dismiss or motion to set aside the jury's verdict. *See Osborne*, 372 N.C. at 626, 831 S.E.2d at 333; *Duncan*, 136 N.C. App. at 520, 524 S.E.2d at 811.

## CONCLUSION

Defendant failed to preserve for appellate review his constitutional challenge to the search warrants in this case. We deny his petition for writ of certiorari and dismiss that portion of Defendant's appeal. In addition, Defendant has not shown that trial counsel's performance was deficient, and we dismiss Defendant's claim of

ineffective assistance of counsel. Finally, the trial court did not err in denying Defendant's motions to dismiss or motion to set aside the jury's verdict.

DISMISSED IN PART; NO ERROR IN PART.

Judges WOOD and THOMPSON concur.